**CARRIER CORPORATION, a Corporation, Respondent,**

v.

**ROYALE INVESTMENT COMPANY, a Corporation, Appellant.**

No. 49230.

Supreme Court of Missouri, Division No. 1.

March 11, 1963.

Rehearing Denied April 8, 1963.

Shifrin, Treiman, Agatstein & Schermer, St. Louis, for appellant.

Harry S. Gleick, Lawrence Sanders, St. Louis, for respondent, Carrier Corp., Gleick, Strauss & Friedman, St. Louis, of counsel.

Wilbur B. Jones, amicus curiae—referee, St. Louis, attorney pro se.

HOUSER, Commissioner.

Equitable action to recover $40,870 claimed due on a contract for the sale of air conditioning equipment; to establish and enforce a mechanic's lien, and for a decree of priority over a subsisting deed of trust. The trial chancellor found the issues for plaintiff on the contract, adjudged the lien and its priority, and the owner of the realty has appealed. We have jurisdiction because the record affirmatively shows that the amount in dispute exceeds the sum of $15,-000.

The petition was in the usual form of an equitable mechanic's lien suit, joining as defendants another lien claimant and the trustee and beneficiary of the deed of trust.

In its original answer Royale pleaded breach of warranty. In its first amended

answer it sought rescission of the contract. In its second amended answer and in its counterclaim Royale alleged that the contract "is of no further force or effect and Plaintiff is not entitled to recover," and sought damages on the theory that Carrier's representatives made fraudulent representations inducing Royale to purchase the equipment in question; reliance upon and falsity of the representations; consequent damage in that the equipment was worthless for its purposes and was abandoned, and Royale was forced to spend large sums for substitute equipment. Royale offered to return the equipment to Carrier. The prayer was for dismissal of the petition and judgment for the amount Royale paid on account and for expenses incurred for electric wiring, steam fitting, and duct work ($53,547.45 actual) and for $100,000 punitive damages, an aggregate total of $153,-547.45.

The court appointed a referee who conducted hearings, made and entered findings of fact and conclusions of law, and recommended judgment in favor of Carrier and against Royale. The court approved the report of the referee and entered judgment for Carrier for $30,870 on its petition and against Royale on its counterclaim, adjudged a mechanic's lien and its priority, and awarded the referee an $8,000 fee.

The vital question raised by appellant is whether the contract is vitiated by fraud. On this review our duty is to determine whether Carrier, through its agents, knowingly made material representations of fact with intent that Royale act thereon; whether Royale was entitled to and did rely thereon; whether the representations were true or false, and if false, whether Royale was thereby damaged. We review the case upon both the law and the evidence as in suits of an equitable nature, § 510.310(4), RSMo 1959, V.A.M.S., de novo on the whole record, making our own findings of fact, drawing our own conclusions of law, and rendering or directing

the rendition of such judgment as equity and justice may require. Maas v. Dreckshage, Mo.App., 244 S.W.2d 397, and cases cited, l.c. 400. The findings of the referee, who heard the witnesses and had an opportunity to judge of their credibility, are a factor to be considered, although his report does not have the standing of a special verdict. Schwartz v. Shelby Construction Co., Mo.Sup., 338 S.W.2d 781.

From the transcript of 1,408 pages, answers to interrogatories, and the exhibits, we find these to be the facts:

In 1957 Royale Investment Company, owner of Ambassador-Kingsway Hotel in St. Louis, contracted for and started construction of a two-story addition adjacent to the seven-story hotel. The corporation, through Bernard Tureen, its president and chief executive officer, an experienced hotel man, retained and consulted with the firm of Rathert and Roth, architects; employed R. K. & A. Jones as general contractors, and consulted with Lester Hundelt of Consolidated Engineering & Sheetmetal Company, designers and installers of air conditioning equipment. The new two-story addition was to be air-conditioned, and Hundelt, who had previously done air conditioning work for the hotel and since 1954 had done all of Tureen's air conditioning on several other buildings under his control, was to install the duct work. Tureen discussed with Hundelt the amount of tonnage that would be required for the new addition. Tureen had on hand four 50-ton electrically driven Chrysler centrifugal air conditioning machines, complete with compressors and water chillers, ready for installation in the new two-story addition.

Early in February, 1958 Harold Westphal, an employee of Laclede Gas Company, visited Charles Weiseman, chief engineer and maintenance man for Royale, and aroused his interest in absorption air conditioning, which uses gas instead of electricity to generate the necessary energy to operate. Both Tureen and Weiseman pro-

fessed to know nothing about gas absorption air conditioning at that time. Westphal sent Charles E. Hartwein, of the sales department of Laclede Gas Company, to see Weiseman. Tureen was brought into the discussions and Hartwein, Weiseman and Tureen had several meetings. Hartwein stressed the advantages of utilizing a gas absorption machine. He pointed out that the hotel was on a summertime rate for gas which required them to pay a minimum amount whether that amount was used or not and that they were not consuming as much gas as they were paying for; that this gas, being paid for but not used, could be utilized in the operation of a gas absorption air conditioning system, instead of spending money for nothing. Tureen called in his air conditioning consultant, Hundelt, on at least one of these meetings. Although not then familiar with Carrier absorption cooling systems, Hundelt had some experience with gas refrigeration equipment, having installed four, five or six Servel units for a building and realty firm at a shopping center. Hundelt conferred with Tureen on the possibility of savings through the use of gas, and made notations with respect to the cost of electricity. The economy of fuel cost appealed to Tureen. Hartwein presented to Tureen two analyses, Exhibits B and B-1. Exhibit B showed the number of therms of gas used and the amount billed to the hotel during each month of the year 1957. Exhibit B-1 was a per season estimate of the cost of operating a gas absorption machine, steam-driven, as compared with that of an electrically driven machine. The estimate was based upon the assumption that 236 tons of air conditioning were installed, and that the load would be equivalent to 1400 hours of full load operation. It was estimated that 82,600 therms would be used during the months May to September. The analysis estimated that under these assumptions the cost of a gas absorption machine would be $1,152 per season and that of an electrically operated machine would be $3,430, further assuming an elec-

tric rate of 1.25¢ per K.W., or $4,116 at 1.5¢ per K.W.

Hartwein also handed Tureen Exhibit K, a 35-page, glossy-backed, magazine-type brochure entitled "Carrier Automatic Absorption Refrigeration." It contains many photographs and illustrations. It tells "The story of the most remarkable refrigeration machine in the world," a "success story * * * of a major advance in cooling techniques. * * * [T]he story of a machine so simple, so compact, so quiet and so completely automatic that it has been called the most remarkable in the world." Operation of the refrigeration machine is termed "completely automatic. There are no valves to turn, no switches to throw. Just a tiny push button for 'Stop or Go.' Or it can be thermostatically or time-clock controlled." It contains a section on cutting operating expenses, and gives reasons why *under given circumstances* steam power costs and installation costs may be relatively lower on gas absorption systems than electricity costs on electrically powered systems. It points out that there are no major moving parts, and that this type is the smallest and lightest per ton capacity of all types. In the discussion on automatic adjustment to zero capacity the statement is made that "Because of the perfectly smooth load characteristic, the Absorption Machine requires a minimum of attention since the load can fluctuate and chilled water temperatures remain constant without the necessity for an operator to change controls or start and stop the machine." Nine advantages are summarized, among others, the automatic Stop-and-Go feature, as to which it was said: "Starting and stopping the Carrier Absorption Machine is as easy as ringing a doorbell. There are no valves to turn, no switches to throw. Just a single push button for 'Stop-and-Go.' If desired, the human element can be eliminated entirely. A time-clock, for example will start the unit in the morning and turn it off at night." It indicates that "this simplest of all refrigerating machines is as easy to operate

**350**

as it is to install. Its automatic control features, combined with its completely automatic refrigeration cycle, make the Carrier Automatic Absorption unit almost completely self-operating and maintenance-free." "The Absorption Machine is simple and economical to install. It requires no massive foundation, heavy structural support or alignment of compressor or other components." "The simplicity of the system and its automatic controls are such that highly trained specialized operating personnel are not required. There are no operating hazards or chance for damage if the machine is left unattended." "The only moving parts on the entire machine are very small solution, evaporator and purge unit pumps and motors, that require merely simple maintenance procedure. No large drivers or switch-gear to require attention." The brochure contains an explanation of how the refrigeration cycle operates; capacity ratings, steam ratings, heat rejection factors, with examples; physical, engineering and application data, with photographs of the factory, indicating that the finest tools and methods insure economical production. It gives a tribute to the craftsmanship, and the modern and efficient characteristics of the factory, the skills and experience of the workers, and ends with this statement: "This great combination of meticulous attention to detail, deep-seated pride in craftsmanship and modern manufacturing methods results in products unmatched in the industry for quality, performance and dependability."

Appellant claims that the statements in Exhibit K constitute representations and that they are false. We regard the brochure as a whole as dealer's talk, trade talk, puffing of a manufacturer's wares, and sales propaganda. Exhibit K is in the nature of a mailing piece used in advertising to enlist interest in a product. Many of the statements made in it are mere statements of opinion, promises, expectations and estimates, which are not actionable. Many

statements of fact are made, which are supported by evidence. We will subsequently analyze with particularity the statements in the brochure bearing on the five charges of fraud, although we note in passing that nowhere in Tureen's testimony did he state that in purchasing this equipment he relied upon the statements contained in Exhibit K.

Hartwein "did a good job" of telling Tureen of the merits of gas absorption air conditioning. Tureen knew Hartwein as an employee of Laclede Gas Company, working in an effort to increase the sales of his employer's product (gas). Hartwein did not represent himself to Tureen as an agent of Carrier. No Carrier representative held Hartwein out as Carrier's agent, or acknowledged him as such. Hartwein had no connection, directly or indirectly, with Carrier, and no authority from Carrier to sell its products. Carrier did not pay him or contract to pay him for his services, or control or have the right to control his activities. Carrier had furnished Laclede, at the latter's request, a supply of its brochures describing its products, and was aware of the fact that Laclede was promoting the sale of absorption refrigeration, including Carrier's products, and that Laclede's salesman Hartwein was distributing Carrier's brochures to prospective gas users in an effort to sell them equipment of the type Carrier made and sold, but there was no arrangement with respect thereto between Carrier and Laclede. Carrier also knew that Hartwein was trying to promote the use of gas by the sale of the products of Carrier's competitors in the industry, York Corporation, The Trane Company, and Arkla-Servel.

Tureen asked his air conditioning consultant Hundelt to call the Carrier Corporation and get prices on several different sizes of machines they were considering. Up to this time Carrier's representatives had no knowledge of Tureen's interest in their products. On March 7, 1958 Hundelt drove Tureen to Carrier's office, where they

talked to Leonard Miller of the engineering department. Tureen indicated interest in prices of two or three different sizes of absorption machines. He asked for contractor's prices, which are lower than the prices quoted to property owners, and inquired about a special 40% discount below contractor's price. Tureen asked how soon delivery could be made. Tureen was a "hot prospect." Carrier's district manager, A. G. Hillen, and sales manager, Elmer Juneau, were out of town. When they returned they and other representatives of Carrier were instrumental in and participated in sales efforts, conversations and inducements that led up to the execution of the contract of April 16, 1958.

While costs of installation, comparative fuel costs and maintenance were discussed generally by Tureen and the Carrier representatives, the latter did not have before them the Hartwein analyses, Exhibits B and B-1, and did not confirm the correctness of Hartwein's analyses on comparative costs. Hartwein was not present at these discussions. The Carrier people made no representations of fact or specific estimates in terms of dollars and cents with respect either to the cost of installation, cost of gas fuel for the operation of the machine, or cost of maintenance. No economic analyses were made by Carrier. Carrier's salesmen did make representations with reference to the simplicity of operation and ease of maintenance. Hillen and Juneau said that one of the merits of the machine was its simplicity; that it was "push button" and did not require constant vigilance but was virtually maintenance-free; that it did not use expensive freon gas, but inexpensive lithium bromide; that there were few moving parts and therefore little to wear out. In response to Tureen's question about noise they told him there would be some noise resulting from the operation of the fan on the cooling tower, but nothing was said as to the volume of the noise.

Although Tureen was "sold" on this equipment as a result of the sales efforts of Hartwein, Exhibits B and B-1, his conversations with the Carrier representatives and the brochure, he did not contract in credulous reliance upon their statements, arising out of a disparity between his knowledge of gas absorption refrigeration and the expertise and superior knowledge of his informants. Tureen conducted his own investigation, satisfied himself, and entered into the contract of April 16, 1958 in reliance upon his own judgment.

The contract required Carrier to furnish and install a Carrier absorption refrigeration machine, a cooling tower, and a Bryant gas-fired steam boiler, for $40,870, payable as follows: on or before the 10th of each month, 90% of the value of labor and equipment delivered to the point of erection during preceding month, and when equipment is ready for operation, a sum to increase the total payments to 100% of purchase price. Carrier also contracted to furnish the services of a competent absorption specialist to instruct Royale's operating personnel in the proper operation and maintenance of the machine. Royale was to furnish all electrical work; control air piping; chilled water, condenser water, steam and condensate piping; gas piping, and all overtime work.

Carrier delivered the equipment to the site promptly. Royale employed Mossinghoff Plumbing & Heating Company to install the piping, and Naslund Electric Company to do the electrical wiring. Mossinghoff's bill was settled for $17,500 and Naslund's bill was $4,000. The machine was placed in operation September 16, 1958. Carrier called on Royale for payment, none having been made pursuant to the terms of the contract, and was advised by Tureen to write Jefferson Bank and Trust Company for payment, that bank being the escrow agent in connection with a deed of trust on the hotel property. Carrier wrote the bank September 22, 1958, and on the same day Carrier extended the warranty period to one year from June 1, 1959, in view of the fact that the system had gone into operation

so late in the cooling season of 1958. No payment was received in 1958 from the bank or from Royale.

Shortly after the machine went into operation in September, 1958 it developed trouble in the gas jets in the boiler. It took three or four days to correct this. It took "a bit longer" to get the proper balance going in the system. It was operated only for a short time—the balance of the month of September—during the fall of 1958. During this time there was excessive noise from the cooling tower, resulting in a complaint by the police department and by an anonymous telephone caller. The noise was uncomfortable in several of the hotel rooms. Carrier's service department provided a sound engineer at whose recommendation several changes were made in the tower, resulting in a reduction of the noise to a level of 10% above ambient (background) noise. In the winter of 1958–59 Tureen, contemplating the air conditioning of certain guest rooms, delivered to Carrier a floor plan and asked for an estimate on the installation of a fan coil under the window air conditioning units in these rooms. Carrier, not having received payment under the contract of April, 1958, did not figure this estimate.

On May 1, 1959 Royale paid $10,000 on account. On or about the same day Weiseman, unable to make the machine start, called on Carrier to get the machine in operation for the coming season. The machine was "cold" and there was difficulty working up steam because the boiler was sized for normal operations, not for a cold machine. The machine was put in operation by two of Carrier's engineers, after about eight hours of work. Later Weiseman was unable to start the machine because something went wrong with the controls. This was corrected by Carrier. Early in June it lost its vacuum and ceased operating. This was corrected by Carrier. During the 1959 season Carrier made approximately ten service calls. According to Royale the machine lost its vacuum five

or six times in the next 40 days. Carrier's John McCabe denied knowledge of more than one such occasion. In July, 1959 Royale put 10 tons of self-contained air conditioning equipment in the area to be cooled, and used the Carrier equipment only intermittently between July and September. At the end of the season Royale employed Carrier to shut the machine down and "winterize" it, a $58 all-day job. Carrier accounts for the poor performance on the ground that Mossinghoff omitted certain valves from the installation, the purpose of which was to check the flow of water (one of the chief difficulties was that there was too much water flow); that a gummy substance or dirt found its way into the mechanism causing it not to operate for the time being, this apparently having been introduced into the pumps because of failure of Mossinghoff to install a strainer; that there was dirt in the "T" restrictor which controls the length of the dilution cycle; that in the absence of Carrier service personnel someone would tinker with and manipulate the adjustments on the machine and change the controls, thereby causing trouble.

Royale's defense is based upon fraudulent misrepresentations, not on breach of warranty or failure of consideration. Five separate charges of representation were made.

■ First, it is charged in the second amended petition that Carrier, its agents and servants, represented that the equipment was an efficient and economical installation and that the amount of gas to be consumed in the operation would be substantially less than the cost of electricity to operate an electrically powered unit of the same capacity. The evidence Royale introduced in an effort to prove that this representation was made and that it was false is insufficient to sustain this charge. Royale relies heavily on Exhibits B and B–1, but they do not constitute false representations of material facts. There was no proof that any of the assumptions upon which B–1 was based

existed as facts in the actual operation in the year 1958. Tureen recognized and accepted B–1 as an estimate, and nothing more than an estimate. As an estimate B–1 constituted an opinion or judgment, but not a representation of an existing fact upon which a right to recover for fraud might be based. "Thus there can be no redress for error in representations which are expressed and understood as mere estimates or judgments, * * *." 37 C. J.S. Fraud § 10a, p. 227, fn. 23. In Burlison v. Weis, Mo.App., 152 S.W.2d 201, the agent of the defendant told the prospective purchaser of a heating plant that the cost of heating the house and doing the cooking would not exceed $75 or $80 a year. This was held to constitute promises or expectations, not representations of existing facts, and as such insufficient as a basis for an action for fraudulent representations. In Boston Consol. Gas Co. v. Folsom, 237 Mass. 565, 130 N.E. 197, statements that a gas-fired boiler for heating a house would not cost much more, if any, than the purchaser had been paying to heat his house; that it could be done "for about the same," if untrue, were not representations of material fact, but merely matters of opinion, judgment or estimate, insufficient to sustain an action of tort. Appellant seeks to avoid this rule by invoking the exception where the promissor has or professes to have superior knowledge based upon past experience, citing Nichols v. Hendrix, Mo.App., 312 S.W.2d 163, but there is no showing that Hartwein had or professed to have superior knowledge of the fuel consumption or cost of operating gas absorption machines of the size and capacity involved, based upon past experience. This cannot be inferred from the mere fact that Hartwein had been "employed in the sales department" of the gas company for twelve years.

■ Royale's evidence that Exhibit B–1 was false is not convincing. In an attempt to prove its falsity Royale had Mr. Behrens, an employee of the billing division of the gas company, prepare Exhibits Q and Q–1 a compilation of gas company figures as to gas consumption at the hotel from January, 1957 through November, 1960. They show the number of therms used monthly; the rates under which the therms were billed (General, Interruptable and Optional), and the amount of the monthly bills. The interruptable rate is a cheaper rate allowed a customer who has stand-by alternate equipment which the gas company can require the customer to use in periods of great demand on the gas company, thus relieving the consumption of gas. In previous years the hotel was equipped with a Kewanee oil-burning boiler for stand-by use, enabling the hotel to enjoy the more favorable interruptable rate. Tureen, knowing that the Bryant boiler purchased from Carrier could not be used for oil, and that the interruptable rate would no longer be available, determined to buy the Bryant boiler and removed the Kewanee boiler. In 1957, 1958 and 1960 there were two accounts, a general rate for cooking, and an interruptable rate for water heating and steam. In 1959 there was only one account, billed at the optional rate. Using figures from previous years on consumption of gas for cooking, water heating, and making the computation on the interruptable (rather than the optional) rate, he attempted to figure the bill for gas consumed in the air conditioning system during the months the air conditioning was on in 1959. Royale contends that according to Mr. Behrens' computations the rates were more than double the cost estimated on Exhibit B–1. Behrens conceded that these figures were inexact and not absolutely correct, because the allowances for cooking and water heating were based on the previous year's figures rather than 1959 figures. Mr. MacClurg, manager of project development in the sales department of the gas company, testified that in determining whether there had been an increase in gas consumption after installing the air conditioning system, and the extent of any such increase, the following factors during the seasons under comparison would have to be considered:

the amount of gas used for cooking, water heating, space heating and air conditioning; the number of public and private parties; whether the swimming pool was heated; weather conditions, and room occupancy. The difference between interruptable and optional rates would also affect the situation. Such an analysis is a problem for the sales engineering division; not for the billing division. There having been no testimony as to these factors, we find Behrens' testimony unreliable proof of the falsity of Exhibit B-1, and no testimony directly impeaching Exhibit B-1 having been introduced, we are not prepared to declare it false.

Carrier's brochure, Exhibit K, contains no actionable misrepresentation of fact with reference to economy of operation. It says that hundreds of installations around the world attest to its economy; that it converts seasonably idle or excess boiler capacity into substantial savings of dollars; that it uses the cheapest of all refrigerants—common tap water; that it offers economies worthy of "your most serious investigation"; that where steam costs are relatively low it cuts operating expense; gives factors which enter into operating cost analyses under given conditions in various localities and under favorable gas rates frequently encountered; quotes from a buyer in Dallas, Texas whose choice of this equipment was influenced by a comparative cost analysis of operating expense and who stated that his firm's substantial yearly savings enable them to amortize the equipment over a shorter period, and a buyer in Cincinnati who said his firm selected this equipment because of the economies involved in operating costs. Each such statement may be classified either as sales talk or as a qualified statement of fact the falsity of which was not shown.

Tureen testified that Hillen, Juneau and Hartwein said "there would be a great saving in cost because the centrifugal machine * * * is bound to lose its freon gas, which is expensive. Gas was so much cheaper that it would pay for itself in the long run to have this machine. * * * [A] cost saving factor * * *" and Weiseman testified that Hillen and Juneau both stated many times that the gas absorption system "could operate far cheaper than electric, and the installation cost was minimum" and that they showed "by comparison between electric and gas where this was cheaper," but we have found that Carrier's representatives made no representations of fact with reference to the cost of operation.

The first charge fails for lack of proof.

The estimate given by the alleged agent Hartwein not having been actionable, and not having been proved false, the question whether Carrier is responsible for the actions of Hartwein on the ground of actual or implied agency or agency by estoppel, becomes immaterial.

■ Second, it is charged that Carrier, through its representatives Juneau and Hillen, and by its brochure, Exhibit K, represented that the operation and maintenance of the equipment after its installation involved simple routine attention and care without requiring specialized expert maintenance and repair work. Royale did not carry the burden of proving this charge. The overwhelming weight of the testimony is that, considering the size and capacity of this equipment in comparison with electrically operated air conditioning systems of equal size and capacity, it is in fact comparatively simple in operation and maintenance. Independent and impartial witnesses from Washington University, which operates a 700-ton Carrier gas absorption plant, testified that it is a fairly simple operation; that such a plant is operable by stationary engineers, oilers and ordinary maintenance men without special qualifications. Harold Brehm, an independent mechanical engineer, testified that of the three types of units, centrifugal, reciprocating and absorption, the latter is the simplest to install; that its operation is very simple

—a "push button" operation; that all a maintenance crew should need is operating instructions. Gas absorption has fewer moving parts than electrically operated equipment. The only moving parts are small pumps and motors. We find from all the evidence that it is a "push button" operation when in working condition; that it does not take an engineer to operate it; that ordinary maintenance men without special qualifications customarily operate and maintain these machines; that all a maintenance man would need would be the ability to read and understand operating instructions.

Appellant stresses certain "assurances" contained in Carrier's brochure, Exhibit K, intended to convince the prospective buyer "that the equipment is almost completely self-operating and maintenance-free; that no highly trained specialized operating personnel are required, and that there need be merely simple maintenance procedure." The first statement refers only to the automatic control features and automatic refrigeration cycle, and is true. The second statement refers only to certain small electric motors and pumps, the moving parts, and is true. The third statement refers only to the simplicity of the system and its automatic controls, and is true. Appellant questions the brochure statement that "If desired, the human element can be eliminated entirely." In its context this statement is true. It is used in connection with the data on stopping and starting, which is accomplished by a push button, with the explanation that if it is desired to completely eliminate human intervention this may be accomplished by the use of a time-clock.

Appellant considers that Exhibit L, the engineering operational manual, conclusively disproves the representations as to the simplicity of the machine, and argues vigorously that the "Planned Service" offered by the Carrier organization and the suggestion of Carrier-conducted training courses for the owner's help belie the statements that only a minimum of supervision and simple maintenance procedure is involved. The statements about simplicity of operation and maintenance must be taken in their frame of reference, and it must be remembered that "simplicity" is a relative term. This is a large, powerful, commercial installation, simple in comparison to electrically driven machinery of the same capacity, and simple in operation and maintenance to one accustomed to handle such a system, but it is at once obvious, even to a neophyte, that it involves a technical application of electricity, gas, steam, chemistry and mechanics and requires a knowledge and understanding of the theory, principle and construction of gas absorption air refrigeration, and practical experience in this field. While it was shown to be "the simplest of all refrigerating machines," no prospective purchaser, after the most casual examination of the nature of the equipment involved, could reasonably conclude that once installed this extensive system would be self-operating and maintenance-free. Tureen himself revealed that, after investigating gas absorption equipment prior to purchase, he regarded this as a "highly technical piece of equipment." Under the evidence he must be held to have accepted the suggestion of simplicity with a full understanding of the comparative nature of such a description, and a comprehension of the area of reference involved.

The fact that Carrier supplied a technical manual, compiled in engineering terms, thoroughly explaining its construction, operation, and maintenance does not militate against the fact that this is a "simple" system, speaking relatively and in the dimension and context in which obviously the parties were dealing. And the fact that Carrier offered an optional service program does not detract from the fact that dozens of such plants are operated by mere maintenance men without engineering degrees, and in some cases by janitors.

■ Third, it is charged that Carrier represented that Royale's cost of installing the equipment would not exceed the sum of $6,500. Tureen testified that Hillen gave

him an estimate that the cost of installing the unit, including steam fitting, labor and materials, "on the basis of other installations," would be $6,500, but this was specifically denied, and we find that no such statement or estimate was made. While Carrier's representatives engaged in general conversation with Tureen respecting the cost of installation they did not fix any definite amount or suggest any dollar and cents maximum.

Parenthetically, if this testimony of Tureen had been true, Carrier's statements would not have formed the basis of a charge of fraud, for they would have amounted to estimates only and not representations of material fact. Tureen so considered them, for he answered questions as to the "estimates of the cost of installation"; said he did not check with anybody on "those estimates"; compared the "estimate" of the cost of steam fitting with his estimates of the cost of putting in new panels (an expense necessary in an electrically driven installation); referred to "their estimate," and in answer to the direct question "You knew those were estimates?" answered "Yes." He "felt they were safe estimates."

This charge was not established by the statements in Carrier's brochure, Exhibit K, that "Absorption Refrigeration lowers installation costs"; that "the initial installation costs for connecting to the Absorption Machine are usually much less than for providing power services to equivalent motor driven refrigeration equipment"; that "this simplest of all refrigerating machines is as easy to operate as it is to install"; and "[t]he absorption machine is simple and economical to install." These are not actionable misrepresentations of material facts. The first two statements are connected to qualifying statements that apply "Where steam service is already available." A statement that it is "easy" to install is not actionable. Such a term has a comparative or relative connotation. Carlay Co. v. Federal Trade Commission, (C.C.A. 7th Cir.), 153 F.2d 493, 496. The statement

that it is economical to install is coupled with the further statement that it requires no massive foundation, heavy structural support or alignment of compressor or other components (expenses necessary in installing electrically driven equipment). In this context, there is no question that this statement is true.

Not only was there a failure to establish that this "representation" was made, but also a failure to show that it was false. While the contractors testified that the charges made for their work, totaling more than $20,000, were reasonable, we are left in doubt by the evidence whether the work for which these bills were rendered was work exclusively connected with the installation of the air conditioning equipment. Mossinghoff also did work on the swimming pool, in the kitchen, and on the plumbing system generally. Naslund also wired the Caesar Room, put in receptacles, wired the addition over the boiler room, the roof, and worked in the area adjacent to the Caesar Room, in the stair well, stairway and remodeled and electrified the kitchen. It is not clear that the invoices charged to air conditioning did not include amounts properly chargeable to these other works. Royale did not advertise for competitive bids. Tureen asked these contractors what the cost would be, but they were unable to tell him because they were uncertain as to what there was to do. Royale provided no over-all supervision. Mossinghoff was inexperienced in this type of work. It was the first time he had installed a large, commerical absorption machine. Although Carrier's suggested plans were in Tureen's hands as early as May 7, Mossinghoff claimed he did not get the plans for the piping until the last week in June. No one ever gave him any complete instructions as to what was to be done. There was never a complete set of specifications until "the last stage on the job." Mossinghoff did not know where the chilled water coil was to be installed when the job started. On the stand he was unable to give an intelligent answer as to the number of

feet of pipe used in the job. There was duplication of effort, and general inefficiency in the prosecution of the work, unnecessarily adding to the time and expense. There was independent testimony that the wiring of an absorption machine like this should not take more than a week and a half, but the invoices show that 40 days were spent on this job. We conclude that the work was not accomplished economically and with ordinary speed, dispatch and efficiency; that Royale failed to show that an economically efficient installation could not have been accomplished for $6,500.

■ Fourth, it is charged that Carrier represented that the operation of the refrigeration system would be "virtually noiseless and unoffensive to the residents of the Ambassador Hotel and to persons residing in the immediate vicinity." We have found as a fact that in answer to Tureen's inquiry about noise Carrier's representatives informed him there would be some noise but made no representations with respect to the volume of the noise. Juneau told Tureen that occupants of the hotel rooms next to the cooling tower would hear noise, and told him of having occupied a room in another St. Louis hotel on a level with the cooling tower and having been kept awake by the noise, and conceded that his guests would probably have the same experience. Mr. Tureen was not alarmed by this information, and indicated that he would rent those rooms last.

Appellant relies on pages 8 and 9 of Carrier's brochure, Exhibit K, as representations relating to the noise "of the operation of the system," and recites the evidence that the rotating fans in the cooling tower on the top of the roof of the new addition made excessive noise. The statements on pages 8 and 9 made with reference to quiet operation and noise level, however, relate only to the absorption refrigeration machine itself, which was located in the basement. Appellant makes no complaint and introduced no evidence that the machine itself was noisy. Exhibit K makes no reference to quiet operation or low noise level of the *cooling tower*. Statements as to quiet operation of the machine cannot form the basis of a charge of misrepresentation with respect to quiet operation of the cooling tower.

■ Fifth, it is charged that Carrier represented that the refrigeration equipment was capable of producing 174 tons of refrigeration when cooling 418 gallons of water per minute from 55 degrees F. to 45 degrees F. and that the cooling tower as part of the said equipment would cool 700 GPM of water 101.4 degrees F. to 85 degrees F., and it is contended that the equipment failed to so perform. These representations were made and they were representations of material facts. In an effort to demonstrate their falsity Royale's witness Weiseman testified that the water was never cooled under 50 degrees F., and Royale's electrician Arthur Hampton testified that the temperature would run from 50 to 54 degrees F., "progressing down"; that he never recalled the water getting below 48 degrees F., where it would stay maybe ten minutes, maybe an hour, then rise again. For Carrier Henry Klingle, a Carrier serviceman, testified that on the day the machine went into operation, and the next day, September 16–17, 1958, the gauge showed that the water was chilled to 45 degrees F. and that the operation was normal. Mechanical engineer John Aanes of Carrier testified that around May 1, 1959 he observed McCabe do the spring start up procedure and that after the machine was in operation he observed the temperature of the chilled water was between 40 and 45 degrees F. John McCabe, a sales engineer for Carrier, testified that he helped start the machine for the 1959 season (around May 1) and that after the machine was started they got the chilled water temperature; that on several occasions when he serviced the machine that summer the water temperature would be 45, 46 or 47 degrees F. and going down, as he would leave the job. There were occasions when

the equipment failed to draw the water temperature below 50 degrees F. but most of these were times when due to various causes not attributable to Carrier, the system was not properly operating. Insofar as the essential capacity of the equipment is concerned, the testimony of Carrier's witnesses satisfactorily establishes that the system in ordinary operation, properly adjusted and balanced, was fully capable of producing, and did produce, the water temperature represented, and that Royale failed to prove the falsity of this representation.

■ Appellant stresses its right to recover under an exception to the rule that fraud cannot be predicated on promissory statements, or unfulfilled estimates, promises or expectations; that where such statements, etc. were made by one having or professing to have superior knowledge based on past experience, such statements will support an action for fraud, citing Wendell v. Ozark Orchard Co., Mo.App., 200 S.W. 747, 749; State ex rel. St. Louis & San Francisco Ry. Co. v. Daues, 316 Mo. 474, 482, 290 S.W. 425; Doll v. Purple Shoppe, 230 Mo.App. 256, 90 S.W.2d 181, 185; 26 C.J. 1090; 37 C.J.S. Fraud § 11, p. 235. Appellant argues that Tureen and Weiseman were without knowledge of gas absorption systems prior to the solicitation by Carrier, a fact known to Carrier, a well-known and ostensibly reputable company; that in contrast all of Carrier's representatives were graduate engineers and experts in the field, and therefore Tureen had the right to rely on their statements "without an independent investigation of his own." The exception has no application because Tureen did not rely upon their so-called representations without making an independent investigation of his own. On the contrary, he made a thorough investigation, personally and through his chief engineer or maintenance man. Although Tureen testified that Carrier's supporting data was printed in its brochure, Exhibit K, and his chief engineer testified that he and Tureen "went over it" and discussed it, nowhere in his testimony

did Tureen state that he relied upon the statements contained in the brochure, and we find that he did not rely thereon. Tureen stated that he was a business man, and that he was interested in operating costs; that when Hartwein told him about the efficiency and economy of this system he asked Hartwein to give him an "estimate" of gas costs, and that Hartwein gave him some supporting figures, data (never produced at the trial), and a breakdown on comparative costs of operation (Exhibits B and B-1). He checked the data in Hartwein's estimate (the gas bills) with his bookkeeper, and took up the matter with his chief engineer, and his air conditioning consultant and contractor Hundelt. Tureen told Hartwein the facts were highly interesting and that he "would like to learn more about this equipment." He "wanted to know more about the facts," and wanted "to do some checking on his own." He talked to his architects about the estimates. He was "seeing his architects right along." He talked with Hundelt. He compared the cost of installing this system with the cost of installing panel boards. Tureen did not credulously accept the word of the experts without making any investigation to satisfy himself. He wanted to be shown. Carrier told Tureen of three Carrier gas absorption installations in the area. Carrier's Hillen took Tureen's chief engineer to see the Carrier gas absorption plant at Merchant's Exchange Building, where Weiseman talked to the engineer in charge. Weiseman also inspected the Carrier installation at Mallinckrodt Chemical Works. Tureen had the benefit of the advice of his chief engineer, Weiseman, who reported on these inspections, and otherwise informed himself to the point where he was satisfied and willing to recommend to Tureen his purchase of this equipment. Tureen was not hurried into an acceptance. Tureen was first approached in February. Carrier's written proposals were delivered to Tureen on March 25, and by Tureen kept under advisement and investigation until accepted some three weeks later, on April 16.

We conclude that Tureen, a man of wide business experience, entered into the contract with his eyes open; that he did not purchase in reliance upon any false representations by Carrier but upon the basis of estimates, predictions and expectations that were found acceptable by and satisfactory to him, after conducting a thorough, careful, arms-length investigation of his own. With expert advisers and the means of acquiring the necessary information at hand, and after receiving advice and counsel from many quarters, Tureen acted on his own judgment, and not on the basis of any fraudulent representations by Carrier.

The difficulty with Royale's fraud case is that Royale failed to sustain the burden of proving that in the several conferences, or in its brochure, Carrier made any false representations of material fact with reference to its product, upon which Royale relied.

■ Finally, appellant claims that the $8,000 fee awarded the referee is excessive and unreasonable. When the referee was appointed there were seven parties in this litigation, represented by six different firms of attorneys. All of the parties agreed in writing that in making an allowance to the referee the court would not be restricted by the limitation imposed by statute, § 515.220, and Supreme Court Rule 68.22. The referee conducted a preliminary hearing to discuss procedure and expedite the hearing of oral testimony and the presentation of exhibits. Notices of the first hearing on November 14, 1960 were served on all parties or their attorneys, and the taking of testimony began. The hearing was continued from time to time until concluded on February 21, 1961. Briefs were filed, the last one on May 9, 1961, and the case was argued orally on May 5. On May 26, 1961 the referee filed a full and complete report, which occupies 46 pages in this transcript. The transcript of the record, which includes the pleadings, interrogatories, answers to interrogatories, motions, rulings, referee's report, application of the referee for allowance, exceptions, memorandum, findings, conclusions, judgment and decree and after-trial procedure is 179 pages in length. The transcript of the testimony before the referee occupies 1,408 pages. There were 108 exhibits in the case. The referee spent part of 99 different days on this case. He submitted an itemized schedule of the services rendered on each of the 99 days, and the total number of hours invested. Substantial amounts of money were involved, totaling $40,870 on the petition and $153,547.45 on the counterclaim. One question was that of the priority of a $1,000,000 deed of trust on the property. Considerable research in the law was involved in the consideration and disposition of the many and complicated issues. The trial court approved and adopted the report of the referee. Considering the complexity of the issues, the pecuniary amount involved, the amount of work, the time consumed, the careful consideration given the matter from beginning to end, the diligent, prompt and efficient manner in which the referee handled the matter, the quality of his work product and all of the other elements properly to be taken into consideration, we approve the allowance of a fee of $8,000. See Phelps v. Watson-Stillman Co., 365 Mo. 1124, 293 S.W.2d 429, 435.

The judgment was correct and proper and is affirmed.

COIL, C., not participating.

HOLMAN, C., concurs.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.