Mrs. Betty Norma Leschen Phelps, Suzanne L. Naunheim, Amy L. Moore, Edna H. Leschen, John A. Leschen, II, William F. Leschen, and Mary G. Roebling, Plaintiffs-Respondents, v. The Watson-Stillman Company, a Corporation, Defendant-Appellant, No. 45015—293 S. W. (2d) 429.

Division Two, September 10, 1956.

*Mahlon E. Lewis* and *Joseph Renard* for defendant-appellant; *Fordyce, Mayne, Hartman, Renard & Stribling* of counsel.

*Thomas S. McPheeters, E. C. Hartman* and *Thomas S. McPheeters, Jr.,* for plaintiffs-respondents; *Bryan, Cave, McPheeters & McRoberts* and *Hartman & Guilfoil* of counsel.

[431] BARRETT, C.—Pursuant to the provisions of the General Business Corporation Law, the A. Leschen and Sons Rope Company, a Missouri corporation, was merged or consolidated (V.A.M.S., Secs. 351.410-351.450) with the defendant, Watson-Stillman Company, a New Jersey corporation, on July 30, 1953. The plaintiffs, seven minority stockholders, having duly objected to the consolidation, instituted this statutory proceeding (Matter of Fulton, 257 N. Y. 487, 492, 178 N. E. 766, 768) to have the "fair value" of their shares determined "as of the day prior to * * * such merger," July 29, 1953, and paid by the surviving corporation, the defendant-appellant. V.A.M.S., Sec. 351.455.

The A. Leschen and Sons Rope Company was founded in 1857 and incorporated in 1886. The company manufactured wire rope and related products, and its "Hercules" wire rope was internationally famous for its quality. On July 29, 1953, there were 28,022½ shares of common stock issued and outstanding out of an authorized 30,000 shares with a par value of $100 a share. Prior to June 1953 all of the outstanding shares were owned by fifty-six people, many of them descendants of the original founders of the company. The stock was not listed upon any stock exchange, had no over-the-counter market, and so, in the semantics of the market place, was a "close corporation." Through his almost wholly owned holding company, H. K. Porter Company, Mr. Thomas M. Evans of Pittsburgh, Pa. acquired by purchase approximately 70% of the outstanding shares of stock of A. Leschen and Sons Rope Company for the agreed price of $75 a share, eventually acquiring 20,116½ shares for the total price of $1,515,637.50 (which included 276 shares of employee-owned stock for which he was required to pay $100 per share). Included, incidentally, in those who sold majority control for $75 a share were three of the plaintiffs who sold 1184 of their shares. Thereafter, when it was proposed by the new majority stockholders, in effect H. K. Porter Company, to merge the A. Leschen and Sons Rope Company

with the Watson-Stillman Company, a wholly owned subsidiary of H. K. Porter Company, the seven plaintiffs, owners of 7,846 shares of the capital stock of A. Leschen and Sons Rope Company, objected to the merger and, upon consummation of the merger on July 30, 1953, instituted this proceeding to have the "fair value" of their stock determined and paid. At the instigation of the defendant the proceeding was referred to a referee who, after certain adjustments, found the fair value of the 7,846 shares to be $184.80 a share. The finding of the referee was affirmed by the Circuit Court of the City of St. Louis and the defendant, Watson-Stillman Company, has appealed from the final judgment fixing the value of the 7,846 shares at $1,598,318.07 and the award to the referee of $30,000 for his services.

In their amended petition the plaintiffs asserted that the fair value of their stock was $231.76 a share. They arrived at that figure by establishing the net asset value of the company on July 29, 1953, to be $6,494,531, which divided by the total number of shares outstanding, 28,022½, produced a per share value of $231.76. The net asset value was determined by first establishing from the company's balance sheet of July 31, 1953, the stockholders' equity in the company of $5,492,477, capital stock of $2,802,250 plus retained earnings of $2,690,277. To the stockholders' equity there was added to the inventory the sum of $1,017,717 by reason of the conservative "Lifo" method of accounting, $17,551, the value of a subsidiary and the sum of $225,733 representing excess of appraised value of real estate over the amount shown in the balance sheet—all for a total of $6,753,478. From this sum was deducted $232,000 for an inventory loss, established after July 31, [432] and a discount of $26,947 allowed on accounts receivable, thus establishing a net asset value of $6,494,531 or a per share value of $231.76. As stated, the referee made certain adjustments in these computations and reduced the net total assets to $5,178,512.95, thus arriving at the adjudged per share value of $184.80. The referee was of the opinion that these figures were unchallenged and therefore was of the view that he could not alter them or the values produced by these computations.

This method of arriving at the per share value of stock, which the referee and the trial court employed, is known as the "net asset theory" of valuation and throughout the trial of the proceedings and here the plaintiffs have urged its validity and applicability to the particular circumstances of this case. We cannot agree with the plaintiffs that any jurisdiction or authority, except in very limited instances, has adopted or advocated this method of arriving at the fair value of minority stock under statutes permitting majority merger or consolidation. As urged by the plaintiffs and applied by the trial court, asset value was employed in its narrow meaning of "liquidation value," and while asset value is an important factor for con-

sideration, the most significant in the particular circumstances of this case it may be noted, it is rarely if ever the exclusively determinative factor. Annotation 38 A. L. R. (2) 442, 446. American General Corp. v. Camp, 171 Md. 629, 190 Atl. 225, is often referred to for the emphasis it apparently placed upon net asset value. Aside from the vast difference in appellate review—deferring to the finding of appraisers and altering an award for errors of law only; the Maryland court recognized that the determination of fair value of dissenting stock was "a special problem in every particular instance." In that case the merged corporations were engaged in the business of purchasing and selling shares of stock, bonds and mortgages, consequently their assets were liquid and quickly convertible into cash. The appraisers in that case examined earnings and market value but gave them no consideration because of their lack of weight in the particular circumstances. In this case subsequent events have demonstrated the liquidity of certain of A. Leschen and Sons Rope Company's assets. Accounts receivable, some inventory and some real estate were converted into cash within a few months and $1,800,000 cash has been transferred from the Leschen Company assets to the Watson-Stillman Company. In this respect there is some analogy in the circumstances of the two cases, accounting, in part, for the weight to be attributed to net asset value, but not the 100% weight given by the trial court. Despite the analogy and even its possible advisability, the A. Leschen and Sons Rope Company was not in point of fact liquidated (V.A.M.S., Secs. 351.460-351.480), it was merged or consolidated under the statutes (V.A.M.S., Secs. 351.410-351.455) and the dissenting stock must be valued accordingly. Another startling example of liquid assets is Chicago Corporation v. Munds, 20 Del. Ch. 142, 172 Atl. 452, where $21,658,694.02 of assets consisted of over three million dollars in cash, three million dollars in short term securities and notes and over fifteen million dollars in stocks and bonds. But in that case too much emphasis was placed upon quoted market value with the result that the appraisers' report was rejected. Ahlenius v. Bunn & Humphreys, 358 Ill. 155, 192 N. E. 824, is also often cited for its supposed emphasis on net asset value. But the Supreme Court of Illinois pointed out that the stock was to be valued "by the fair market value of the corporate property *as an established and going bus'ness*," and said that "Precise rules for determining the value, whatever the descriptive term used, cannot be laid down." The court pointed out in great detail the factors to be considered even though "The . very nature of most cases precludes proof of value and damage with the precision of mathematical computation. A situation is presented [433] which calls for the exercise of judgment upon consideration of every relevant evidential fact and circumstance entering into the value of the corporate property and reflecting itself in the worth of corporate stock." The basic difficulty with the net asset theory is that it ignores the

policy and purpose of the statutes permitting majority consolidation and the valuation of shares of dissenting minority stockholders. Chicago Corp. v. Munds, supra; Ballantine, Corporations, Sec. 289, p. 681; 45 Har. L. R. 233; 32 Col. L. R. 60.[1]

In the various statutes the terms "value," "fair value," "fair cash value" and "fair market value" are abstract and in a sense perhaps meaningless (2 Bonbright, Valuation of Property, p. 827); they nevertheless have the same general meaning and purposefully if not wisely establish a flexible general standard for fixing value between parties who are either unable or unwilling to voluntarily agree. Ballantine, Corporations, Sec. 299, pp. 704-706; Anderson v. International Minerals & Chemicals Corp., 295 N. Y. 343, 67 N. E. (2) 573. As previously noted, there is no simple mathematical formula and each case presents its particular problem, but in general some of the factors to be considered and weighed are asset value, earnings, dividends, management and "Every relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of corporate stock * * *." 45 Har. L. R., l.c. 262; Austin v. City Stores Co., 89 Pa. D. & C. 57; annotation 38 A. L. R. (2) 442. It is neither necessary nor desirable to attempt a further enumeration of the factors, tangible and intangible, which ultimately constitute the "opinion" or "matter of judgment," it is sufficient to say, in addition to the factors specifically noted, that the following list of cases indicate in broad general outlines not only the policy and purpose of the statutes but the factors to be considered in determining the fair value of dissenting minority stock: Austin v. City Stores Co., supra; Ahlenius v. Bunn & Humphreys, supra; Application of Behrens, 61 N. Y. S. (2) 179; In Re Silverman, 122 N. Y. S. (2) 312; Root v. York Corp., 29 Del. Ch. 351, 50 Atl. (2) 52; Tri-Continental Corp. v. Battye, 31 Del. Ch. 523, 74 Atl. (2) 71; Heller v. Munsingwear, Inc., (Del.) 98 Atl. (2) 774 and see the annotation 38 A. L. R. (2) 442.

In general, the appellant contends that these cases indicate the appropriate factors. In their brief there is this summary: "* * * in the case of stock of a close corporation without a market requires the consideration and proper weighting of many factors. These factors include the earnings history of the company, its dividend record, its net asset value and working capital at the statutory critical date, the trend of its operation, the company's position in the industry, its prospects as a going concern at such date without regard to the

---

[1] The other numerous and invaluable law review articles, many of them placing special emphasis upon, if not urging, some particular factor or theory, are cited in the cases, annotations and texts and for that reason are not cited in this opinion. They, as well as brochures and texts, both popular and technical, have all been read and only the ill-advised would ignore them in approaching the problems of minority stock valuation under the statutes. See also annotations 87 A. L. R. 597; 162 A. L. R. 1237; 174 A. L. R. 960.

effect of the proposed merger, its investment value as a going concern, its investment yield, the prospects of its growth or decline within the industry, its cash position, its management, and the price upon which a willing purchaser and a willing seller would agree if no merger had been contemplated.'' It is not necessary to say whether this statement is precisely accurate in all respects, it is sufficient to say that upon this record the appellant's argument is rather academic than practical. The appellant's expert or opinion witnesses valued the plaintiffs' shares at $65.00 to [434] $76.20. In arriving at these values the witnesses adhered to these tests and factors, if at all, in a very vague manner. In substance they examined two or three comparable companies, some of them integrated as the Leschen Company was not, and, after arriving at their sales, profits, earnings, dividends, et cetera, over a period of years arrived at a per share market value for the stock of those companies. These computations were then "related'' to the A. Leschen and Sons Rope Company's balance sheets and operating statements and thus a per share "hypothetical market value'' of $65.00 to $76.20 was established for the plaintiffs'. stock. Comparison with other companies may provide a valuable check or an analogy and supporting evidence (Austin v. City Stores Co., 89 Pa. D. & C., l.c. 71), but it was stipulated in the beginning that this stock had no market value and in the circumstances the "hypothetical market value'' established in this manner was not the true measure of its value. Chicago Corp. v. Munds, supra. The appellant's witnesses gave no independent consideration to net asset value, they did consider "book value'' and from the eight factors considered attributed to that value a weight of one-eighth.

The plaintiffs contend, whatever the appropriate tests and factors but again with especial emphasis upon liquidation of the Leschen Company's assets, that the fair value of their shares is $184.80. The appellant urges that it is for this court first to establish the standard of valuation and second, it is suggested, not accepting the values contended for by the parties, that this court evolve a formula and appraise the stock's fair value. In this connection it is suggested that the formula employed in the Munsingwear case, 98 Atl. (2), l.c. 777, should be given some consideration. But as of course a caveat should go with that and similar formulas, as the Delaware court specifically pointed out. Austin v. City Stores Co., supra; Sterling v. Mayflower Hotel Corp., (Del.) 93 Atl. (2) 107. The formula was peculiarly appropriate to the circumstances of that case and by more or less arbitrarily changing the weight to be attributed to the four factors of asset, market, dividend and earnings values the court altered the appraisers' value from $23.20 per share to $20.08 a share. In the case of In Re General Realty & Utilities Corp., 29 Del. Ch. 480, 52 Atl. (2) 6, other factors were not of sufficient importance for consideration in assessing the value of preferred

stock and the formula was again applied, the court reducing the appraisers' value of $120 to $108 per share. In Application of Behrens, supra, the court in valuing preferred stock carefully considered all the relevant factors and reduced the appraisers' award of $28.45 per share to $20.00. In valuing R. Hoe & Co. stock in Application of Silverman, supra, the New York court again considered all the pertinent factors but in conclusion rather summarily increased the appraisers' award of $7.50 to $10.00 per share. In short, whatever the type of stock to be valued, we have found no case in which there was such disparity in values as there is in this case. The plaintiffs have no opinion evidence and insist upon the valuation of $184.80, emphasizing, as indicated, net asset if not liquidation value, while the appellant's opinion evidence, based on "hypothetical market value," indicates a value of $65.00 to $76.20 a share, it is tacitly conceded, for the purposes of argument only, that a precise application of the Munsingwear formula would produce a fair value "of something between $79.84 and $109.98 per share," depending upon the multipliers employed. Accepting the maximum produced by the Munsingwear formula there remains a minimum difference of $74.52 per share, a difference of $584,593.92.

This proceeding, having been tried before a referee, is subject to review in this court "upon both the law and the evidence as in suits of an equitable nature." V.A.M.S., Sec. 510.310(4); Nieberding v. E. M. Stivers Co., (Mo. App.) 227 S. W. (2) 462; Baerveldt & Honig Const. Co. v. Dye [435] Candy Co., 357 Mo. 1072, 212 S. W. (2) 65. The rule and our duty in this respect, however, presuppose a record and evidence from which the court can perform this function with some degree of confidence in the reasonableness, fairness and accuracy of its final conclusion. Leggett v. Mutual Commerce Cas. Co., (Mo.) 250 S. W. (2) 995. All the facts and circumstances have been carefully considered, the formulas have been tentatively tested, repeatedly we might add, and any final appraisement by this court of the fair value of this stock upon this record would certainly not be an "intelligent judgment" or an "informed opinion" but sheer speculation and for that reason the cause upon its merits is reversed and remanded. Pridmore v. Whiting Corp., 268 Ill. App. 592.

■ And now we are confronted with the unrewarding task of passing upon the reasonableness of the $30,000 fee allowed the referee. Recognizing its inadequacy, the parties waived the statute governing the fees of referees (V.A.M.S., Sec. 515.220) and left the fixing of the fee to the trial court. The following is the referee's resume of his services: "At the time I was appointed Referee in this matter in July, 1954, I endeavored to familiarize myself with the pleadings and statute involved. I read some outside articles prior to the hearings that were held before me as Referee. * * * I think there was some twelve sessions all told before the Referee, one of them included the

oral argument. I believe there was eleven in which an official record was made. There was some 600 pages of testimony and I think there was approximately 60 exhibits presented either by the Plaintiffs or Defendant. Printed briefs were furnished by the Plaintiffs and Defendant, and those respective briefs, as they were furnished in addition to a few textbooks cited—probably cited some 70 or 80 cases. I did not examine all of the so-called 70 or 80 cases, but I did examine those cases that I considered to be what might be termed leading cases on both sides of the question. * * * I came to the conclusion that throughout all of these cases, what was probably one clear cut threat, and that was that all of these cases probably have to be decided on their own salient facts, and that the most difficult case to decide is the type we are presented with, or, namely, a closed or family corporation. * * * I would say I put in approximately 300 hours, in connection with the report I drafted some three or four times. Cutting it down—cutting it down, and finally I tried to draft a report that would leave the parties absent any adverse comment of mine or included in the report anything that would bolster it up. * * * If I approach it from the standpoint of days (and Justice McReynolds says 5 hours was a competent professional day) it would be a matter of 60 days.''

Despite our disagreeing with the referee's conclusion upon the merits of the proceeding, it is obvious from the record and his report that he thoroughly appreciated the issues and problems and performed his duty in a most creditable manner. The proceeding involves a large sum of money, the problems are intricate, novel and difficult, nevertheless, by any standard, the $30,000 allowance is obviously excessive in the sum of $18,000. 76 C. J. S., Secs. 220-225, pp. 316-321; 45 Am. Jur., Sec. 20, p. 556.

Accordingly, the judgment as to the referee's allowance is reversed and remanded with directions to enter a judgment for $12,000 and, as indicated, the judgment upon the principal proceeding is reversed and the cause remanded. *Bohling, C.,* concurs in result; *Stockard, C.,* concurs.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.