Robert H. **FLARSHEIM**, Plaintiff-Appellant,

v.

**TWENTY FIVE THIRTY TWO BROADWAY CORPORATION**, Defendant-Appellant.

No. 52888.

Supreme Court of Missouri, Division No. 1.

Sept. 9, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 14, 1968.

Harry P. Thomson, Jr., Oscar S. Brewer, Kent E. Whittaker, Kansas City, for plaintiff-appellant, Shughart, Thomson & Kil-

roy, Brewer & Myers, Kansas City, of counsel.

David Skeer, Leonard Rose, Kansas City, for defendant-appellant, Sheffrey, Ryder & Skeer, Kansas City, of counsel.

STORCKMAN, Judge.

The plaintiff and the defendant corporation both appealed from a judgment finding and determining the fair value of plaintiff's shares of the capital stock of the defendant corporation. The action is a statutory one under § 351.405, RSMo 1959, V.A.M.S. The plaintiff voted his shares against a sale of the property and assets of the defendant and in due time took the required preliminary steps and filed suit as provided by the statute.

The trial court sitting without a jury determined the fair value of plaintiff's 4376 shares to be $77.00 per share, for a total value of $336,952.00. The plaintiff contends the fair value per share on the valuation date was $110.00. The lowest amount testified to by defendant's expert witness is $47.54 per share. This court has jurisdiction of the appeal because the amount in dispute, exclusive of costs, exceeds the sum of $15,000.

The name of the defendant, a Missouri corporation, was changed from Seavey & Flarsheim Brokerage Company to Twenty Five Thirty Two Broadway Corporation about March 1, 1966. Its business was that of a food broker and was founded as a partnership in 1890. As a broker, the defendant served various manufacturers, packagers and processors of food in the sale and distribution of their products at both wholesale and retail levels. Over the years the business was quite successful; it had offices in ten midwestern cities and represented over 300 producers sometimes referred to as principals.

At the time in question, Louis Flarsheim was president, treasurer, and a director of the company; the plaintiff Robert Flarsheim was vice-president and a director.

Each owned 4376 shares out of a total of 31,906 shares issued and outstanding. Henry Flarsheim, the father of Louis and Robert and one of the founders of the company, owned 17,504 shares which at the time of his death were placed in a testamentary trust. Another son Clarence had previously worked for the company but owned no stock. The trustees of the Flarsheim Trust were Mrs. Henry Flarsheim and the brothers Louis, Robert and Clarence until about January 14, 1966, when Robert resigned. There were nineteen individual shareholders, all of whom were officers and employees of the company.

The defendant being a brokerage company had little or no inventory or stock in trade although it owned considerable real estate, some of which was used for headquarters and office purposes. The success of the business depended largely upon a capable sales and service force. In recent years when Robert and Louis became less active in the business, there were unsuccessful negotiations on several occasions directed towards a sale of the shares of the Flarsheim Trust or a portion thereof to the officers and employees of the company exclusive of Robert and Louis. In the fall of 1965, Marsh H. Blackburn, president of Hoosier Brokerage Company, began negotiations for the purchase of the brokerage business of Seavey & Flarsheim and a contract was entered into under date of January 17, 1966. This contract provided for the purchase by Hoosier of all of the physical properties, the exclusive right to the name Seavey & Flarsheim Brokerage Company, together with the good will, business records and going-concern status of Seavey & Flarsheim. Excepted from the sale were non-operating assets, such as securities held by the company and generally referred to as the investment account.

On February 12, 1966, the directors and shareholders of the defendant met and all of the shareholders except the plaintiff and another approved the contract and voted in favor of the sale of the assets. The sales

agreement was concluded on February 28, 1966, the corporate name of the defendant was changed, and the Hoosier Company assumed the trade name of Seavey & Flarsheim Brokerage Company.

On March 1, 1966, the plaintiff delivered to the defendant his written demand for the payment of the fair value of his shares as of February 11, 1966, the day before the sale was approved as provided by § 351.-405. No agreement was reached and the plaintiff filed this action to determine the fair value of his shares.

The first order of business at the meeting of the directors on February 12 was the adoption of a resolution recommending to the shareholders that the corporation "be completely liquidated and dissolved in accordance with the plan of liquidation attached" to the minutes. The plan insofar as pertinent to the issue before us provided that the corporation be completely liquidated and all of its assets be distributed to its shareholders within 360 days from the adoption of the liquidation plan in accordance with the provisions of § 337 of the 1954 Internal Revenue Code of the United States. The plan also provided that the company should execute and file with the secretary of the State of Missouri its articles of dissolution at such time as determined by the board of directors but not later than the 299th day of the period beginning on the date of the adoption of the plan of liquidation, and upon the filing of such articles the company would cease to carry on any business except for the purpose of winding up its affairs. It further provided that the plan of liquidation would become effective as of February 12, 1966, if approved at that time by a vote of the shareholders holding not less than three-fourths of the voting shares of the company.

The next resolution approved by the directors at the February 12 meeting was a recommendation that the agreement for the sale and purchase of assets entered into under date of January 17, 1966, by Seavey & Flarsheim Brokerage Company, as seller, and Hoosier Brokerage Company and Marsh H. Blackburn, as purchasers, and a collateral agreement of the same date be ratified and approved by the shareholders. Other resolutions designed to implement the plan of liquidation and the carrying out of the agreement for the sale of the business were adopted by the directors. At a meeting of the shareholders held immediately after the adjournment of the meeting of the directors, all of the recommendations of the directors were accepted and adopted by a vote of more than three-fourths of the shares entitled to be voted. The plaintiff, Robert Flarsheim, however, dissented and voted against the sale of the business to the Hoosier Company.

At the outset we are confronted with the defendant's contention that the plaintiff is not entitled to maintain the action for valuation of his shares because the sale of assets to which he dissented was "a sale in liquidation in the process of dissolution of defendant's corporate existence, and therefore plaintiff was entitled to only a stockholder's distributive share and not to a separate appraisal." The plaintiff's petition filed May 10, 1966, briefly stated the facts and alleged that the action was brought pursuant to § 351.405. In its answer filed June 3, 1966, the defendant admitted the allegations of the petition and further alleged that the fair value of the shares on the valuation date was either the same or a lesser amount than had been offered and tendered to plaintiff which was the amount per share that would be paid to other shareholders out of the total assets of the corporation.

The contention that § 351.405 was not applicable was first raised in defendant's motion for summary judgment filed August 23, 1966. The motion asserted that the sale of assets referred to in plaintiff's petition was a sale pursuant to "a legally adopted plan of liquidation and dissolution under the provisions of Sections 351.465 and 351.470" and that a dissenting shareholder had no right to demand the fair value of his shares when the sale is part of the liquida-

tion of all assets as a necessary step to the dissolution of a corporation. Copies of the minutes of the meetings of directors and shareholders held February 12, 1966, and other documents were filed in support of and in opposition to the motion. The trial court heard the motion for summary judgment and overruled it October 14, 1966. One of the grounds in the defendant's motion for a new trial is that the plaintiff had no standing to maintain the suit or to have his shares appraised.

The plaintiff counters with the contention that the defendant corporation was not in liquidation on November 30, 1965, when the directors authorized the president to negotiate and execute a contract with Hoosier Company or on February 12, 1966, when the contract of sale dated January 17, 1966, was approved by the shareholders; that the company continued in the brokerage business until February 28, 1966, and did not file its articles of dissolution as required by § 351.470 until September 1, 1966, and up to that time was free to carry on its usual business. It is apparent that the "plan of liquidation" adopted by the defendant was primarily concerned with compliance with § 337 of the Internal Revenue Code which provides that, if a corporation adopts a plan of complete liquidation, and if all of the assets of the corporation are distributed, less assets retained to meet claims, within a twelve-month period after the adoption of the plan, no gain or loss shall be recognized to the corporation from the sale or exchange of its property during such period. There is no requirement in the federal statute that the corporation cease to do business at any specific time as there is in § 351.470, subd. 2, pertaining to the dissolution of a Missouri corporation. The resolution adopted by the directors at their meeting on November 30, 1965, provided that the sales agreement would not be binding unless a plan of liquidation under § 337 was first adopted. The plan of liquidation specifically states that its purpose is to comply with § 337. It is apparent, however, from the plan and the contract of sale and actions taken pursuant

thereto, that the defendant intended along with the sale of its assets to wind up its business, distribute the remaining assets to the shareholders, and dissolve the corporate existence.

Voluntary dissolution of a Missouri corporation may be accomplished by the corporation upon compliance with §§ 351.465 through 351.480. This is the procedure on which the defendant relies for immunity from the suit for appraisal by the plaintiff under § 351.405. The procedure to dissolve under § 351.465 is initiated by the holders of at least two-thirds of the outstanding shares adopting a resolution to dissolve the corporation voluntarily. The statute then requires the execution in duplicate of "articles of dissolution" which are delivered to the secretary of state. Section 351.470. If the articles are in order, the secretary of state files them, keeps one copy for his permanent record, and returns the other to the corporation. Section 351.470 provides that upon filing of the articles of dissolution by the secretary of state, the corporation shall cease to carry on its usual business, shall collect its assets, shall pay its debts and obligations, and distribute the remainder of its assets to its shareholders. When this has been done, articles of liquidation are filed with the secretary of state and when the secretary issues his certificate of dissolution "the existence of the corporation shall cease." Sections 351.475 and 351.480.

There is no requirement in the Missouri statutes when the winding up of the corporation's business shall be commenced and concluded or that the articles of dissolution be filed at any particular time. The defendant cites authorities that corporate dissolutions may be de facto as well as de jure. See 16A Fletcher Cyclopedia Corporations § 7967, p. 9. It is quite apparent that the procedure provided by §§ 351.465–351.480 is not the exclusive method by which the dissolution of a corporation can be accomplished. Courts of equity have jurisdiction to liquidate the assets of corporations and dissolve their existence. Sec-

tions 351.485 through 351.520. A dissolution proceeding begun by the corporation under § 351.465 may be continued in a court of equity as provided by § 351.470, subd. 3(3). If any corporation shall fail to register or file its antitrust affidavit in the time and manner provided by law, its rights and privileges are forfeited and the secretary of state is required to cancel its license and certificate and dissolve the corporation subject to reinstatement in a limited time and on certain conditions. Sections 351.525 and 147.040.

■ There is a considerable number of instances where corporate officers dispose of the corporate assets in good faith but with little or no regard for the methods of sale and dissolution procedures provided by law. However, the general penalty provision of the corporation law, § 351.715, does not make transactions not in compliance with procedures of the corporation law void as against public policy. Still v. Travelers Indemnity Co., Mo., 374 S.W.2d 95, 101 [4].

The plaintiff urges that Mills v. Penn-Lox Co., Ohio App., 36 N.E.2d 828, is "directly in point" on the proposition that the sale to which the plaintiff dissented was not a sale in liquidation. In the Mills case the defendant corporation contended that the plaintiff did not have the statutory right of a dissenting shareholder because the sale was made and authorized by the Ohio statutes governing corporate dissolutions. The Ohio court held that the plaintiff was entitled to maintain his action because the dissolution statutes conferred on the corporation directors the authority to sell the corporation's assets and, since the certificate of dissolution had not been filed with the secretary of state, the provisions of the dissolution statutes had not been invoked at the time the resolution to sell the corporate assets was adopted. The facts in the Mills case are quite similar to those in the instant case, but the Ohio and Missouri statutes are so dissimilar in vital respects that the case is of little persuasive value.

Sections 1701.86 and 1701.88 of Baldwin's Ohio Revised Code, presently in force, are the relevant sections on voluntary dissolution of corporations and are the same in material respects to the statutes in force when Mills was decided. When a resolution is adopted, the Ohio law requires that a certificate of dissolution be filed with the secretary of state but, quite unlike the Missouri statute, § 1701.86(I) provides that "Upon the filing of certificate of dissolution * * *, the corporation shall be dissolved." Section 1701.88 provides that the directors of the corporation and their survivors or successors shall then act as a board of directors until the affairs of the corporation are completely wound up and that the directors "shall exercise all the authority of the corporation" and, among other things, they may "sell its [the corporation's] assets at public or private sale".

On the other hand, the Missouri statute, § 351.470, subd. 2, provides that upon the filing of the articles of dissolution by the secretary of state the corporation shall cease to carry on its business except that which is necessary to wind up the corporate affairs properly and that "its corporate existence shall continue until a certificate of dissolution has been issued by the secretary of state". The section further provides, subd. 3(2), that the *corporation* shall proceed to collect its assets and dispose of its properties. The Missouri statutes on dissolution do not create the authority or prescribe the manner of selling the corporate assets as does the Ohio statute.

■ The resolution and plan recommended by the directors and adopted February 12, 1966, by a vote of more than two-thirds of the outstanding shares was sufficient to justify the articles filed later with the secretary of state pursuant to § 351.465; hence, it was the initial step in a voluntary dissolution proceeding under the Missouri statutes. The approval and consummation of the agreement to sell the business to Hoosier Company was a further step in the dissolution. The sale of assets and the dissolution of the corporation were mutually

dependent and interwoven. The mere fact that the articles of dissolution were not filed until September 1 did not in view of all of the circumstances nullify or suspend the effect of the action taken looking to a corporate dissolution. We hold that the sale in question was "a sale in dissolution."

As previously noted, the statement of the defendant's point to be argued fails to state as contemplated by S.Ct. Rule 83.05(e) *why* it is contended that § 351.405 is inapplicable to a sale in dissolution. The statement in written argument that §§ 351.-400 and 351.405 are "inconsistent with and cannot apply to the sale" of assets and other acts in corporate dissolution is only slightly more helpful. There does not seem to be any case squarely deciding whether a sale of all the assets of a corporation in dissolution is or is not subject to the right of a dissenting shareholder to be paid the fair value of his shares. The issue must be determined by interpreting the relevant statutes in accordance with established legal principles.

The primary rule in statutory construction is to ascertain and give effect to the legislative intent. State on inf. Dalton v. Miles Laboratories, 365 Mo. 350, 282 S.W.2d 564. The courts must reconcile and harmonize statutes that appear to be in conflict if it is reasonably possible to do so. State ex rel. R. Newton McDowell, Inc., v. Smith, 334 Mo. 653, 67 S.W.2d 50, 56 [6]. Statutes relating to the same subject must be read together, and provisions of one having special application to a particular subject will be deemed a qualification to another statute general in its terms. Eagleton v. Murphy, 348 Mo. 949, 156 S.W.2d 683, 685 [2], 138 A.L.R. 749. The statutes here involved were all adopted at the same time as a part of the general revision of the corporation laws of the state in 1943.

The defendant urges that the distribution provisions of the dissolution statutes are mandatory and exclusive, and that the right of the shareholders to receive the remaining assets is absolute, citing Milgram v. Jiffy Equipment Co., 362 Mo. 1194, 247 S.W.2d 668, 30 A.L.R.2d 925. In that case the trial court in charge of the dissolution proceedings ordered that a patent owned by the plaintiff and the individual defendant be transferred to a trustee with power to continue licensing the patent or to sell it. This court modified the judgment and ordered the patent to be distributed to the parties in accordance with their ownership of the capital stock. The Milgram case does not reach the questions before us.

Sections 351.400 and 351.405 contain no language which suggests that they are inapplicable to sales of assets in dissolution of a corporation. In fact the contrary is suggested by the nature of the subject treated. The sale of all, or substantially all, of a corporation's assets, not in the usual course of business, is highly suggestive of a liquidation of the business and the dissolution of the corporate structure. It would be most unusual for a corporation to sell a going business and start anew in the same line of business. The purchaser would ordinarily exact an agreement not to compete as was done in this case. Converting to an entirely different kind of business is also difficult for an established company. The type of transaction contemplated by § 351.400 is one that tends to interfere with the integrity of the corporation and to impair its capacity to perform its functions. Santa Fe Hills Golf and Country Club v. Safehi Realty Co., Mo., 349 S.W.2d 27, 35–36 [5].

Until changed by statutory enactment, the unanimous consent of the shareholders was required for the transfer of all the assets of a going corporation. 13 Fletcher Cyclopedia of Corporations § 5891; Exchange Bank of Novinger v. Turner, 321 Mo. 1104, 14 S.W.2d 425, 430 [5, 6]. The defendant clearly intended to take advantage of the three-fourths approval feature of § 351.400 in transferring its corporate assets to Hoosier Company. The resolution adopted at the special directors meeting on November 30, 1965, provided, among other things, that the agreement to be executed by de-

fendant's president for the sale of the assets would not be effective or binding on the corporation unless a plan of liquidation under § 337 of the Internal Revenue Code would first be adopted by the directors by such majority of the voting shares as prescribed by law and, thereafter, that the sales agreement "shall have been approved by not less than three-fourths of the voting shares of the capital stock of this corporation." A similar provision as to its binding effect was incorporated in paragraph 8 of the executed agreement. The defendant's interpretation of the vote required is of some significance.

At one place the defendant mistakenly asserts that "Section 351.405 requires an affirmative vote of three-fourths of the shares for the sale or exchange of the corporate assets", whereas a dissolution can be voted by two-thirds of the shares. Section 351.400, subd. 3, does make such a requirement, but § 351.405 does not; the latter simply affords a remedy for dissenting shareholders and sets out the procedure. Regardless of which was intended, however, the attack on the different majorities required would be of no avail because the majority required in each instance is strictly for legislative determination.

■ Statutes dealing with the sale of substantially all of a corporation's assets are designed primarily for the protection of dissenting shareholders of the corporation. Still v. Travelers Indemnity Company, Mo., 374 S.W.2d 95, 100 [2]. It has been said that courts should be careful not to weaken or fritter away by construction the protection given minority shareholders in exchange for dispensing with the necessity of securing unanimous consent of the shareholders for the sale of all or substantially all of the corporate assets. Mills v. Penn-Lox Co., Ohio App., 36 N.E.2d 828, 832 [9]. If not applicable to sales in dissolution, the utility of such statutes would be severely limited.

We would expect to find in § 351.400 the restrictions and limitations on the applica-

tion of the statute. The defendant apparently feels, however, that it derives some power or immunity from § 351.470, subd. 3(2), of the dissolution statutes. By § 351.470, the corporation is admonished to collect its assets, convey and dispose of its properties, pay its liabilities and obligations, and to distribute the remaining assets to the shareholders. It is provided, however, that the *corporation* shall do these things and the statute does not indicate any intention to grant the corporation any new or different powers in disposing of its property and assets or that the corporation shall be exempt from the restrictions imposed by §§ 351.400 and 351.405.

The defendant argues that the mandate to distribute the remaining assets to the shareholders would be interfered with if the fair value of plaintiff's shares is determined to be as much or more than his distributive share would have been. This may happen; however, the dissenter takes the risk of getting less than his distributive share, as was the case in Bauman v. Advance Aluminum Castings Corp., 27 Ill.App.2d 178, 169 N.E.2d 382. Faced with this prospect, the plaintiff in Bauman sought to dismiss. The court held he could not do so for procedural reasons and further stated that the statute gives an election to the dissenting shareholder, but once having made such election by filing suit he must carry it through to a legal conclusion and he cannot dismiss his suit and "resume his status as a stockholder." 169 N.E.2d at p. 385. The Model Business Corporation Act provides that "no such demand may be withdrawn unless the corporation shall consent thereto." Model Bus.Corp.Act Ann. § 74, ¶ 1.

■ The 1943 revision of the Missouri corporation law was patterned after the Illinois statutes. Santa Fe Hills Golf and Country Club v. Safehi Realty Co., Mo., 349 S.W.2d 27, 34–35. There is no essential difference between the Missouri and Illinois statutes in the respects with which we are concerned. See Smith-Hurd Illinois Annotated Statutes, Ch. 32, §§ 157.71–157.73. Section 351.405 provides upon pay-

ment of the fair value of his shares, either by agreement or judgment, the dissenting shareholder shall cease to have any interest in said shares or in the corporation and that such shares may be held and disposed of by the corporation as it sees fit. The clear intention of § 351.405 is to change the status of a dissenting shareholder to that of a creditor at least superior to the distributive rights of the remaining shareholders. In 13 Fletcher Cyclopedia of Corporations § 5898, p. 333, it is stated that: "The right of dissenters to payment takes precedence over the right of other stockholders to distribution." See also Narragansett Electric Lighting Co. v. Sabre, 50 R.I. 288, 146 A. 777, 783–784 [15], 66 A.L.R. 1553. This is the bargained exchange for the abolition of the requirement of unanimous consent to approve a transfer of the assets of a corporation. 13 Fletcher Cyclopedia of Corporations § 5891, p. 310.

■ The courts can impose no limitations on the right of a minority stockholder under § 351.405 to be paid the fair value of his shares which are not compelled by the statutory law. We find no inconsistency in applying §§ 351.400 and 351.405 to a sale of assets under § 351.470, subd. 3(2). The formula for sharing in the remaining proceeds "according to their respective rights and interests" is applicable to the remaining shareholders after those of the dissenting shareholder have been eliminated and after the payment to him of the fair value of his shares whether it is more or less than he would have received as a shareholder who approved the sale. The plan of liquidation also specifies that the distribution to shareholders shall be in proportion to the number of shares held "at the time of such distribution". We have examined all of the authorities cited and they are not persuasive that § 351.405 is inapplicable to a sale in dissolution.

The defendant's argument that a minority shareholder would have a remedy by injunction or for fraud if he is imposed on by the majority is not convincing. The general assembly has seen fit to give the dissenting shareholder the right to demand the fair value of his shares and step aside as a shareholder. He should not be relegated to the more cumbersome and less satisfactory procedure which existed at the time the appraisal statutes were enacted.

This case demonstrates how abuses could result without the protection of § 351.405. In addition to the transfer of assets including good will, most of the employees of the defendant, including Louis Flarsheim, continued wtih the new company. Some of the former shareholders of defendant subscribed to purchase shares in the new company. The transaction in some respects was in the nature of a corporate merger under § 351.410 with the original Hoosier Company as the surviving corporation. For some business purposes the parties so treated it. The announcement sent to principals and customers stated that the two corporations were "pleased to announce their merger". The defendant corporation referred to it as a "merger" in advising its employees of the transaction. Section 351.455 specifically gives a dissenting shareholder in a merger the right to elect to be paid the fair value of his shares in the same way as in the case of a sale of corporate assets.

■ Our conclusion is further buttressed by the fact that the Model Business Corporation Act was revised in 1962 to make it clear that §§ 73 and 74, which are the same in legal effect as §§ 351.400 and 351.405, apply as well to a sale in dissolution. Model Bus.Corp.Act Ann. § 73(b), ¶ 1, pocket parts, and § 74, ¶ 1. Statements in the following cases also tend to support our holding that §§ 351.400 and 351.405 are applicable to a sale in voluntary dissolution of a Missouri corporation under §§ 351.465–351.480: Kirwan v. Parkway Distillery, Inc., 285 Ky. 605, 148 S.W.2d 720, 722–723 [1]; Eisenberg v. Central Zone Property Corp., 306 N.Y. 58, 115 N.E. 2d 652, 655 [1, 2]; In re Hurd's Petition, 5 Misc.2d 443, 159 N.Y.S.2d 895, 897 [2], and Alcoma Corporation v. Ackerman, 26 Misc. 2d 678, 207 N.Y.S.2d 137, 143 [8]. The

contention that the plaintiff has no standing to maintain this action is denied.

As a part of his brief as respondent, the plaintiff has presented a motion to dismiss defendant's two remaining points as appellant on the ground that it has failed to make a "fair and concise statement of the facts without argument" in violation of S.Ct. Rule 83.05(a) (2), V.A.M.R. The points complained of relate to the court's findings of fact and conclusions of law and to the method of determining the value of plaintiff's stock. The attack upon the defendant's statement of facts charges in substance that it contains material misrepresentations, that the selection and arrangement of testimony is misleading and argumentative, that it fails to state ultimate facts and has included a great mass of irrelevant matters designed to create a false atmosphere or background adverse to the plaintiff. The transcript consists of more than 1,000 pages. The ascertainment of the validity of plaintiff's charges would involve a factual determination practically as difficult as deciding the case on the merits. The defendant's statement does not on its face disclose a flagrant violation of Rule 83.05(a) (2). In these circumstances the motion to dismiss is overruled. Hammond v. Crown Coach Co., 364 Mo. 508, 263 S.W.2d 362, 367 [8]; Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S.W.2d 764, 765 [1].

In rendering its judgment the trial court made detailed findings of fact and conclusions of law. Each party filed a motion to amend the judgment as allowed by S.Ct. Rule 73.01(c); in the alternative, the plaintiff moved for a new trial. The trial court amended its judgment in certain particulars and the defendant now contends that several of the new findings ought not to be given any credence by this court because the amendments made were not the court's findings and conclusions but rather those of the plaintiff. In support of this contention, the defendant cites Process Engineers, Inc., v. Container Corporation of America, 7 Cir., 70 F.2d 487, which held that findings prepared by appellee's counsel and given by the court which combined argument and partisan statements of fact were not binding on the appellate court though they were supported by some evidence and it would make its own findings. The difference in practice would make the case inapplicable. Nevertheless, we have examined and compared the requests of the plaintiff with the amended findings by the trial court and we find no such blind acceptance as appears in the case cited. The suggested amendments were rejected in several respects. The amendments made by the court bespeak a judicial determination in all respects. The defendant's contention is denied.

The plaintiff contends the trial court erred in admitting the opinion evidence of defendant's witnesses Wallace Cook and G. Kenneth Baum. Mr. Cook is an assistant vice-president of Kansas City Life Insurance Company and a financial analyst in charge of bonds and stock portfolio of that company. Mr. Baum is in the investment banking business and the president of George K. Baum and Company. The plaintiff urges that the opinions of the witnesses did not constitute substantial evidence of fair value under § 351.405 because they had no previous experience in valuing a food brokerage business and their opinions were based on insufficient data and were not supported by sufficient reasons. The cases cited by the plaintiff deal largely with the qualifications of expert witnesses in jury cases and the sufficiency of evidence upon which their opinions were based. In this case tried without a jury, the value of the testimony of Mr. Cook and Mr. Baum and the methods and standards used by them must be determined according to the credibility of the witnesses and the probative value of the evidence. The questions of fact presented were for the determination of the trial judge and are subject to review by this court. The trial court did not err in admitting the evidence in these circumstances.

For reviewing a case tried on the facts without a jury, these guidelines are provided by S.Ct. Rule 73.01(d): "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." See also § 510.310, subd. 4. On the issue of fair value, the defendant in its appeal calls on us to reverse the trial court's judgment fixing the fair value at $77 per share and find instead that the value is $47.54 a share. On the other hand, the plaintiff in his appeal contends that the amount found by the trial court is inadequate and that the fair value on the evaluation date was $110 per share. The remaining questions relate to the determination of fair value.

██ Under § 351.405 the "fair value" of the capital stock of a dissenting minority shareholder is to be determined by the courts as of the day prior to the date on which the vote was taken authorizing the sale of the corporate assets. The provision is the same as in the case of a shareholder who dissents to a consolidation or merger. Section 351.455. The term "fair value" as used in the valuation of shares of a dissenting shareholder is not a rigid criterion but establishes a flexible general standard for fixing the value between parties who are either unwilling or unable to agree. Phelps v. Watson-Stillman Company, 365 Mo. 1124, 293 S.W.2d 429, 433 [2]. In the sense here intended, "fair" is defined in Webster's Third New International Dictionary as "reasonable" or "equitable as basis for exchange". The same dictionary gives this meaning and explanation of "fair value": "a reasonable value (as set by courts and regulatory commissions) for property—used esp. in application to public-utility property for rate-making purposes". The judicial determination of value must be an informed judgment, but "fair value" is not susceptible of determination by any precise mathematical computation and no

one formula or figure is binding or conclusive. Phelps v. Watson-Stillman Company, 365 Mo. 1124, 293 S.W.2d 429, 433 [3]; Woodward v. Quigley, 257 Iowa 1077, 133 N.W.2d 38, 53 [18], 136 N.W.2d 280; Dewing, Financial Policy of Corporations, 5th Edition, Vol. 1, p. 277.

██ The record of this case demonstrates why there is no one approach or method by which "fair value" can be determined. From among the extreme claims of interested parties, the widely varying opinions of financial experts and the extensive business and other records, the court must select a figure it deems to be in accordance with the legislative intention in vesting the court with the determination of the fair value of dissenting shares. This does not mean that all courts or all members of the same court will or must arrive at precisely the same figure because we are admonished by Rule 73.01 (d) not to set aside the judgment of the trial court unless we find it to be clearly erroneous. We have reviewed the case on both the law and the evidence as in a suit of an equitable nature and find as the trial court did that the fair value of the plaintiff's stock on February 11, 1966, was $77.00 per share.

The company was one of a kind commonly referred to as a "close corporation" in that, except for the Flarsheim Trust, the stock was owned by a comparatively few persons who were active in the management of the company and the shares were not listed on any exchange or otherwise traded by the public. There had been no recent sale of shares.

Robert, Louis, and Clarence Flarsheim and a sister, Martha F. Irwig, were beneficiaries of the Flarsheim Trust. Since Robert and Louis had no children, none of the Flarsheim family would be active with the company after their retirement. There seems to have been a rather well-settled intention on the part of the family to sell the individual and trust shares to the officers and employees of the company if a

price could be agreed upon since they had contributed much to the success of the company and future prospects would be enhanced if the stock were owned by the operating and managing employees.

In 1961 there was a proposal to sell some of the Flarsheim Trust shares to the Seavey & Flarsheim Profit Sharing Trust which was set up for the benefit of defendant's employees in lieu of a pension plan previously existing. A price of $81.18 per share was arrived at by the parties with the help of counsel and three appraisers who characterized the price as "a fair and reasonable value" and "on the conservative side". However, the Internal Revenue Service to whom the proposal was submitted refused to approve the Seavey & Flarsheim shares as an investment for the Profit Sharing Trust because the company was not then paying dividends but was allowing earnings to accumulate as additional capital assets. At a meeting held October 3–4, 1964, the directors of Seavey & Flarsheim found the fair market value of the shares to be $70 plus the net earnings per share for the year ending October 31, 1964, which amounted to $5.83 per share, and recommended to the shareholders that the 17,504 shares held by the Flarsheim Trust and 1,480 shares each of the holdings of Robert and Louis be redeemed at that price by the corporation. Clarence Flarsheim, one of the trustees, objected to certain features of the proposal and it was abandoned. On July 10, 1965, a majority of the trustees of the Flarsheim Trust offered to sell the Trust's stock to the corporation for cash at $55 per share so that it could be purchased by the employees. The offer was not accepted within the time limited and the offer was revoked by the trustees when a more favorable one was proposed by Marsh Blackburn. Robert testified that he agreed to the offer because he thought the employees were entitled to acquire the business at a price less than its actual worth.

The first proposal made by Mr. Blackburn in September 1965 was that a portion of the Trust's shares would be sold to him for $65 per share and the remainder would be redeemed by the corporation at the same price. Robert Flarsheim was not included as a member of the negotiating committee appointed by Louis Flarsheim from the members of the board of directors. Some of the employees continued their efforts to purchase the shares directly but were unable to do so. The first Blackburn offer was then changed to a proposal that the Hoosier Company purchase the assets of the defendant corporation. This proposal was embodied in the agreement dated January 17, 1965, which was approved by the directors and shareholders on February 12, 1966, and consummated on February 28.

At the court's urgent suggestion, the parties stipulated that "the book value of the company" on February 11, 1966, was $1,706,259.33, the same amount shown by the audit of October 13, 1965, which amount divided by 31,906, the number of outstanding shares, produced a book value of $53.47 per share; that such book value should be used in testimony of value on the "earnings approach"; and that for the purpose of providing uniform testimony on "the net assets approach" the sum of $63.50 would be used.

As to be expected, there was much difference of opinion as to the proper multiplier to be used in capitalizing earnings and dividends and the weight to be given the various results in arriving at fair value. It was admitted that the price-earnings ratio for the 30 stocks used in computing the Dow Jones Industrial Average at the close of business on February 11, 1966, was between 18 and 19, the yield of the stocks was 2.92%, and the closing average was 989.03. The witnesses also differed as to how much of the value of real estate and automobiles should be allocated to the investment account as opposed to operating capital.

The witnesses were also far apart on what value if any should be ascribed to the "good will" of a service organization

such as a food brokerage business. Some of the differences probably arose from a failure to agree on what the term included. Webster's Third New International Dictionary defines "good will" as: "the custom of a trade or business: the favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude, or any other circumstance incidental to the business and tending to make it permanent." The Random House Dictionary gives this definition: "an intangible, salable asset arising from the reputation of a business and its relations with its customers, distinct from the value of its stock and other tangible assets." See also Hodde v. Hahn, 283 Mo. 320, 222 S.W. 799, 803 [6]. This intangible is sometimes referred to as good will, going concern, or organizational value. It is apparent that a business which has prospered for 75 years and has more than 300 principals and a highly competent association of food brokers of long experience, as well as young replacements, in these circumstances has a substantial value beyond its tangible assets. The company had more than 100 employees in ten midwestern offices. It would take years and great expense to collect and train such capable talent. The highest paid of the account managers earned $50,000 per year and the average earnings of the top personnel was estimated to be more than $20,000 per year.

If there was any unusual dissatisfaction on the part of the officers and employees, it appeared to stem from their inability to obtain at least a controlling interest in the company's shares at a time when Robert and Louis Flarsheim were looking forward to retirement or a less active role in the affairs of the defendant. The gross brokerage fees and net earnings had continued to increase during the years. There were losses of some accounts and acquisition of others in the long history of the company but nothing of a catastrophic nature, at least in recent times. The greatest problem in recent years arose out of the representation of both cane sugar and beet sugar principals whose products had become highly competitive. After passage of the Sugar Act of 1959 which increased the quota of the beet sugar producers, the cane sugar people became apprehensive about a possible conflict of interest on the part of the broker and wanted assurance that their interests were not being neglected. The cane sugar principals were the largest single source of brokerage fees; the defendant had represented one of them since 1906. The problem was inherent in the representation of intensely competitive interests and difficult to eliminate entirely, but the evidence is persuasive that the value of the shares should not be depressed on the supposition that both accounts could not be retained.

Mr. Louis Flarsheim was called as a witness by plaintiff and testified concerning the transaction generally but was unable or unwilling to put a value on the stock of the defendant corporation although he had in the past endorsed higher values than found by the court. The plaintiff who had been associated with the defendant company in various capacities for forty years testified that the fair value of his stock was $110 per share. In support of his valuation he offered two theories or approaches. Under what is termed the investment theory, the plaintiff calculated the 1965 earnings at $6.00 per share which he capitalized 9 times to get a value from operations of $54 per share. To this he added $56.54 per share based on his evaluation of the accumulated or investment assets to get a total of $110.54 per share. By what is termed the gross brokerage theory, the plaintiff added to the stipulated book value of $53.47 per share the amount of $57.38 based on 83% of $2,206,000, the gross brokerage for 1965, which he deemed to be the fair value of the going concern or its good will. This produced a total of $110.85 per share.

On behalf of the deefndant, the two witnesses heretofore mentioned testified regarding value. Neither had evaluated a food brokerage business before. Mr. Wallace Cook based his opinion on the company's financial audits for the years 1961 through 1965 and its income tax returns. He arrived at a valuation in the area of $63 or $64 per share. Using the dividend method he multiplied the $2.60 annual dividend by 17 to get the value from operations. He gave the result as $42.20 but it should have been $44.20. He also used the earnings approach. Although the company's 5-year-average earnings after taxes appeared to be $4.04, Mr. Cook took a figure of $4.00, multiplied it by 11, and got a result of $44.00. He explained that in making appraisals he always rounded off the figures with which he worked. In his own words: "I took the midpoint of 42 and 44, I added $17.00 for the value of the very fine portfolio, I gave two or three dollars value to some real estate, that seems to have value, I arrive at a figure of $63.00. I have no value given for a going business or inventory, because it doesn't seem to be any." On cross-examination he revised his valuation of some of the investment assets and conceded that the fair value was $75 per share although on re-direct he tended to revert to "the $63.00–$64.00 area."

Mr. G. Kenneth Baum on behalf of the defendant was of the opinion that the fair value of the stock was $47.54 per share. In support of his opinion he found the going-concern value to be $45.80, the net asset was $63.50, the total-earnings value was $37.89, and the market-value method was $65.00. He did not average these results but weighted them at 80%, 5%, 7½% and 7½%, respectively. In calculating going-concern and total-earnings valuation, Mr. Baum capitalized earnings 4 and 9 times, respectively.

In its findings of fact the trial court found that the fair value of the stock was between $74 and $80 per share and in the exercise of its judgment fixed the value at $77 per share. In checking the reasonableness of its determination, the court calculated the investment-asset value to be $43.54. It capitalized the net operating earnings after taxes 9 times for a value of $32.04. This added to the investment value per share totalled $75.58, which the court weighted at 50% for the sum of $37.79. The dividend rate of $2.60 multiplied by 17 produced $44.20, which added to the investment value of $43.54 gave a total valuation on the dividend theory of $87.74 which was weighted 25% for a result of $21.935. Total earnings before taxes of $7.76 was multiplied 9 times for a value of $69.84 which weighted at 25% added $17.46. The weighted values of $37.79, $21.935, and $17.46 made a total value per share of $77.185.

The court found that the gross brokerage theory advanced by the plaintiff could not be utilized to determine the fair value inasmuch as no instance had been shown where the theory had been used on the basis of the gross brokerage in the year preceding the sale as plaintiff sought to do. The plaintiff contends that the court erred in refusing to consider the gross brokerage theory as a relevant fact in arriving at the fair value. This as well as many other facts in evidence were straws in the wind which were properly admitted as a part of the entire picture, but we agree with the trial court that plaintiff's valuation based thereon was unrealistic in the circumstances of this case. The plaintiff also attacks the court's use of the investment theory, the dividend theory, and the capitalization of total-earnings theory as tests of its value judgment. We have considered all of plaintiff's assignments of error; they are not persuasive that the valuation of $77 per share should be increased.

The defendant complains that the court treated operational assets as investment assets in applying the earnings-investment theory, erroneously included investment assets in its computation of the dividend theory, erroneously included expenses as though they were earnings in computing the total-earnings theory, and erroneously

adopted multipliers far greater than the defendant-corporation's experience and circumstances warranted in computing values on the earnings-investment theory and on the total-earnings theory. Cases from other jurisdictions, especially Delaware, and other authorities are cited, but they are not persuasive of a different result on the facts of this case. To discuss them all in detail would over-extend an opinion which is already too long. The defendant's evidence is not convincing that the fair value of $77 should be decreased.

The transcript of the record clearly shows that the trial court gave painstaking and intelligent consideration to the relevant evidence and the various contentions of the parties. Its judgment was reasonable and equitable. Our finding of fair value accords with that of the trial court.

The judgment is affirmed.

All concur and HAYES, Special Judge, concurs.