In re Milton D. RATNER, Debtor.

COLE TAYLOR BANK, an Illinois State Chartered Bank, Plaintiff,

v.

Milton D. RATNER; Alexander S. Knopfler, Interim Trustee; Carrier Distribution Credit Corporation, a Delaware corporation; Altheimer & Gray, a partnership; Evanston Bank, as Trustee under Trust Agreement Number 1294; Richard E. Friedman; Marjorie L. Friedman; Joseph Greene; John Hopkins; Stella Klabacka; Patrick Athy; Patrick Reilly; Catherine Reilly; William Boyd; Cornelius Riordan; Eugene Riordan; David Sypniewski; I–Del Incorporated, an Illinois corporation; Marvin Lourie; John Wheeler; Maynard Wheeler; Neal Kaufman; Francine Kaufman; Rachel Ratner; Gary Ratner, as Custodian for Uri Ratner; Gary Ratner, as Custodian for Yael Ratner; JGF Partnership; Rentar Trailer & Container Leasing Co.; Charlotte E. Thomson, as Executor of the Estate of John C. Thomson; Charlotte E. Thomson; Richard Webber; Michael Sullivan; and unknown Owners, Defendants.

Bankruptcy No. 91 B 04569.
Adversary No. 91 A 0728.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Sept. 30, 1992.

Alexander S. Knopfler, Chicago, Ill., trustee.

Eugene Crane, Glenn R. Heyman, Scot Clar, Dannen, Crane, Heyman & Simon, Chicago, Ill., for trustee.

Stephen B. Diamond, Lawrence Schad, David J. Phillips, Beeler, Schad & Diamond, P.C., Chet Gettlemen, Adelman, Gettleman & Merens, Ltd., Chicago, Ill., for dissenting shareholders.

David Schaper, Keck, Mahin & Cate, Chicago, Ill., for Carrier Distribution Credit Corp.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint for interpleader and declaratory relief filed by Cole Taylor Bank (the "Bank") as escrow agent of certain property held in escrow. The defendants are individuals and entities having conflicting claims to the escrowed property and its proceeds. The relief sought is a determination as to the defendants' rights to the escrowed property. For the reasons set forth below, the Court having considered the pleadings and evidence presented at trial by way of testimony and exhibits, post-trial pleadings and exhibits, does hereby make and enter the following findings and conclusions. The Court holds that all shareholders of the dissolved Illinois corporation, Ford City Corporation, share pro rata interests as tenants in common in the proceeds held in escrow.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. FINDINGS OF FACTS

The facts giving rise to the present proceeding had their origin sometime in 1983 even though Milton D. Ratner's (the "Debtor") bankruptcy petition was not filed until the middle of 1991. Consequently, a great deal of background is necessary to understand, as well as decipher, the various parties' claimed interests in the escrowed property. For ease of reference, therefore, the Court will chronologize its findings.

A. Undisputed Factual Background

On or about August 25, 1983, Ford City Corporation ("FCC") agreed to sell its principal asset—shares of common stock of Ford City Bank and Trust Co.—to Cole Taylor Financial Group, Inc. Dissenting Shareholders' Exhibit No. 1, p. 4. Two months later, FCC's shareholders held a meeting on or about October 24, 1983, to consider the proposed sale and FCC's subsequent liquidation. At that meeting, FCC's shareholders approved the sale and adopted a plan of liquidation. Trustee's Exhibit No. 2; Dissenting Shareholders' Exhibit No. 1. The approval, however, was not unanimous.

FCC's outstanding shares numbered 135,279.72. The shareholders approving the sale owned 119,732.77 or approximately 88.5% of FCC's outstanding shares and are as follows: the Debtor, Milton D. Ratner—80,159 or 59.3%; Evanston Bank, as trustee under Trust Agreement No. 1294—71 or .05%; Richard and Marjorie Friedman—140 or .1%; Joseph Greene—100 or .07%; John Hopkins—460 or .34%; Stella Klabacka—400 or .3%; Patrick Athy—100 or .07%; Patrick and Catherine Reilly—300 or .22%; William Boyd—1,939.77 or 1.4%; Cornelius Riordan—266 or .2%; Eugene Riordan—267 or .2%; David Sypniewski—267 or .2%; I–Del Incorporated—14,492 or 10.7%; Marvin Lourie—10 or .0074%; John Wheeler—115 or .085%; Maynard Wheeler—704 or .52%; Dr. and Mrs. Neal Kaufman—10 or .0074%; Francine Kaufman—698 or .516%; Gary Ratner as custodian for Uri Ratner—10 or .0074%; Gary Ratner as custodian for Yael Ratner—10 or .0074%; JGF Partnership—1,351 or 1%; Rentar Trailer & Container Leasing Company—873 or .65%; and Rachel Ratner—17,000 or 12.6%.[1] Joint Stipulation, ¶ 4A–W.

1. The percentages are rounded to the nearest whole number for convenience of reference.

As noted, the remaining shareholders dissented from the proposed sale to the Bank. Those shareholders held 15,546.95 or approximately 11.5% of FCC's outstanding shares. The dissenters are as follows: Charlotte E. Thomson—2,092.56 or 1.6%; John C. Thomson[2]—12,193.39 or 9%; Richard E. Webber—291 or .2%; and Michael F. Sullivan—970 or .7%. *Id.* Thomson, Webber and Sullivan will be hereinafter collectively referred to as the "Dissenting Shareholders."

In accord with Illinois law, the Dissenting Shareholders demanded an appraisal of their shares of stock from FCC within 20 days of the sale approval. Dissenting Shareholders' Exhibit No. 2. No agreement as to the price to be paid the dissenters was reached within the next forty days. Joint Stipulation, ¶ 7. Thereafter, the Dissenting Shareholders within one hundred days of the meeting, on January 31, 1984, filed an action in the Circuit Court of Cook County, Illinois, seeking appraisal of their shares. Dissenting Shareholders' Exhibit No. 3. The parties commonly refer to this state court action as the "Thomson Litigation," which remains pending and is scheduled for trial commencing on October 14, 1992. Joint Stipulation, ¶ 8. FCC filed an answer, denied liability for the relief sought, and asserted certain defenses to the merits of the appraisal remedy. Dissenting Shareholders' Exhibit No. 4.

Prior to the Thomson Litigation, FCC was the subject of other litigation commonly referred to as the "Sullivan Litigation." Consequently, FCC established the "Sullivan Escrow" in May 1984, pending final resolution of the Sullivan Litigation. That litigation was resolved without diminution of the escrowed property. Paragraph 7.3 of the Sullivan Escrow provides that upon resolution of that litigation, the escrow property is to be:

> Distribute[d] to [Ford City Corporation], or in the event that [Ford City Corporation] has been liquidated, to the majority shareholder of [Ford City Corporation] at

the time of such liquidation, any [Escrow Property] not distributed [for resolution of the Sullivan Litigation].

Dissenting Shareholders' Exhibit No. 5; Trustee's Exhibit No. 3.

On January 1, 1985, FCC established the "Ford City Corporation Second Liquidating Trust" (hereinafter referred to as the "Liquidating Trust"). Dissenting Shareholders' Exhibit No. 6; Trustee's Exhibit No. 4. The Liquidating Trust provided in relevant part that:

> [Ford City Corporation] has outstanding certain potential liabilities in connection with a lawsuit [the Thomson Litigation] brought by certain former shareholders of the corporation in pursuit of their alleged appraisal rights....
>
> .    .    .    .    .
>
> The purposes of the Trust ... are to ... [meet] ... and [pay] ... the Liabilities.
>
> .    .    .    .    .
>
> [Ford City Corporation] hereby assigns and distributes to the Trust all of the Corporation's assets, rights and properties not heretofore distributed by the Corporation, including without limitation, (i) a certificate of deposit in the principal sum of approximately Two Hundred and Three Thousand Dollars ($203,000), (ii) all of the Corporation's rights under certain reimbursement agreements dated June 1, 1984 executed by Milton D. Ratner on behalf of himself and certain Beneficiaries ... and (iii) all of the Corporation's rights under a certain Escrow Agreement dated May 31, 1984 [the Sullivan Escrow]....
>
> .    .    .    .    .
>
> This Trust shall terminate on that date (but not more than three (3) years from the date of this Agreement) when (i) all the Liabilities have been paid, compromised, settled, discharged, or become barred by law as the case may be....

Dissenting Shareholders' Exhibit No. 6; Trustee's Exhibit No. 4. At the time of establishing the Liquidating Trust and at

---

**2.** John C. Thomson subsequently died, and Charlotte E. Thomson was appointed executor of his estate.

all relevant periods thereafter, the Debtor was a director, president and majority shareholder of FCC, and a trustee of the Liquidating Trust. Joint Stipulation, ¶ 9.

On April 16, 1985, FCC dissolved. Joint Stipulation, ¶ 13. Subsequently, in 1990 through 1991, the Debtor claimed that the Liquidating Trust had expired. Therefore, he paid out to his own creditors and some of the shareholders of FCC, all but $8,500.00 held in the Liquidating Trust. Joint Stipulation ¶¶ 9 and 10. In paying those shareholders of FCC, the Debtor also notified them that the Dissenting Shareholders' appraisal action—the Thomson Litigation—remained pending and that all assets they received from FCC would be subject to the Dissenting Shareholders' claims. Dissenting Shareholders' Exhibit Nos. 8, 9 and 10. On March 4, 1991, the Debtor filed a Chapter 7 bankruptcy petition and thereafter died. Joint Stipulation, ¶ 18.

### B. History of the Proceedings

The present complaint was filed on July 15, 1991. Joint Stipulation, ¶ 19. Summons and complaint were issued and served on July 18, 1991. Joint Stipulation, ¶ 20. The matter was initially assigned to the Honorable Susan Pierson Sonderby. On August 28, 1991, Judge Sonderby allowed the Bank's motion to deposit the escrowed property with Alexander F. Knopfler (the "Trustee"), as Trustee of the Debtor's estate. Shortly thereafter, pursuant to 28 U.S.C. § 455, Judge Sonderby recused herself and the matter was reassigned to the undersigned for further disposition.

After turnover to the Trustee, the Bank was absolved of any further responsibility concerning the escrowed property and was dismissed as a party. At the time of turnover, the Sullivan Escrow held the cash sum of $55,082.01 plus interest earned and accruing thereon, and 2000 shares of Cole Taylor Financial Group, Inc. stock. The subject stock was evidenced by a single stock certificate which on its face showed that FCC was the registered owner thereof. Dissenting Shareholders' Exhibit No. 13.

As previously noted, the gist of the Bank's complaint seeks a determination of the interests of the various defendants' claims against the escrowed property. The only other parties to the Sullivan Escrow agreement were FCC and Cole Taylor Financial Group, Inc. The following defendants answered the complaint: the Trustee; Carrier Distribution Credit Corporation ("Carrier"); Altheimer & Gray; Richard E. Friedman; Marjorie L. Friedman; Stella Klabacka; Patrick Athy; David Sypniewski; John Wheeler; Maynard Wheeler; William Boyd; I–Del Incorporated; Charlotte E. Thomson, individually and as executor of the estate of John C. Thomson; Richard Webber; and Michael Sullivan. The other defendants are in default for failure to plead and otherwise participate in this matter.

The Court entered its Preliminary Pretrial Order on December 27, 1991, setting the matter for pretrial conference on March 12, 1992, and requiring counsel for the answering parties to prepare a joint pretrial statement listing all admitted or uncontested facts, contested facts, and contested legal issues. Only the Trustee, Carrier, Altheimer & Gray, William Boyd, and the Dissenting Shareholders complied with the Preliminary Pretrial Order and attended the pretrial conference. No other party-defendant attended same and complied with the Preliminary Pretrial Order. Consequently, the answers of Richard E. Friedman, Marjorie L. Friedman, Stella Klabacka, Patrick Athy, David Sypniewski, John Wheeler, Maynard Wheeler, and I–Del Incorporated were stricken. By Order entered January 27, 1992, the Court authorized the Trustee to redeem the stock formerly held in the Sullivan Escrow. Dissenting Shareholders' Exhibit No. 15. The Trustee holds the liquidated proceeds thereof pending further order.

■ The Dissenting Shareholders thereafter filed a motion to dismiss for lack of jurisdiction which was opposed by the Trustee, Carrier, and Altheimer & Gray. The Court denied the motion to dismiss for lack of jurisdiction principally on the basis that the bankruptcy court always has juris-

diction to determine what is, or is not, property of the bankruptcy estate under 11 U.S.C. § 541. *See, e.g., Knopfler v. Schraiber,* 97 B.R. 937, 942 (Bankr.N.D.Ill. 1989). Thereafter, the Court entered a Final Pretrial Order and set the matter for trial, which was held on July 27 and July 28, 1992. The only parties who actively participated in the trial were the Dissenting Shareholders, the Trustee, Altheimer & Gray, and Carrier.

### C. Evidence Adduced at Trial

Until after the Debtor filed his bankruptcy petition in 1991, the Dissenting Shareholders were not aware of the establishment of the Liquidating Trust, nor were they aware of the Debtor's action involving same and the distributions therefrom he made. They did not receive written notice of the 1985 corporate dissolution of FCC. None of them have received any payment on account of their shares.

The Dissenting Shareholders' principal attorney representing them in the Thomson Litigation only learned of FCC's dissolution after the Debtor filed his petition. Their attorney did not receive written notice of FCC's dissolution, and only learned postpetition of the existence of, funding to, and the distributions from the Liquidating Trust; nor did he know in late 1984 that the Debtor had written other shareholders advising of the assets placed in the Liquidating Trust; nor did he seek any prejudgment attachment to any fund or property of FCC to secure the Dissenting Shareholders' appraisal rights claim because he thought it inappropriate and unnecessary.

Their attorney testified that the statutory bonding requirements for pre-judgment attachment are expensive and he relied on representations made by FCC's attorney of record in the Thomson Litigation that there were sufficient funds set aside to cover the Dissenting Shareholders' claims. In the Thomson Litigation, the Dissenting Shareholders also seek money damages from the other shareholders who received distributions from the Liquidating Trust. An investment banker rendered an opinion of the per share value of the Dissenting Shareholders' minority interests in FCC as of October, 1983. Dissenting Shareholders' Exhibit No. 11. Based on such opinion, the present value, plus interest, of the Dissenting Shareholders' claims exceeds the amount of the proceeds held by the Trustee. Dissenting Shareholders' Exhibit No. 12.

### III. THE CONTENTIONS OF THE PARTIES

#### A. The Dissenting Shareholders' Arguments

The Dissenting Shareholders' entire line of reasoning rests upon their purported status as secured creditors of FCC by virtue of their appraisal rights. The Dissenting Shareholders' alleged appraisal rights arise out of the then applicable provisions of the Illinois Business Corporation Act. Ill.Rev.Stat. ch. 32, para. 157.73 (1983).

The Dissenting Shareholders contend that pursuant to this statute they "perfected" their appraisal rights because the undisputed facts establish: (1) that they did not vote for the sale; (2) that they demanded from FCC payment of the fair value of their shares within twenty days of the shareholders' meeting and vote; (3) that they and FCC failed to agree upon the value of their shares within forty days of the shareholders meeting and vote; (4) that FCC failed to pay them for their shares within ninety days of the shareholders meeting vote; and (5) that they filed their still pending complaint in the Thomson Litigation seeking statutory appraisal of their shares within sixty days of the end of the forty-day period in conformance with all the above statutory requirements. The Dissenting Shareholders conclude that they have a perfected security interest in the Sullivan Escrow property.

As secured creditors of FCC, the Dissenting Shareholders next contend that the common law has long treated a dissolved corporation's assets as being held in trust to satisfy corporate creditor claims. Once these claims have been satisfied, the remaining assets may be used to pay shareholder claims. The Dissenting Sharehold-

ers cite a number of supporting cases. Thus, the Dissenting Shareholders' status as secured creditors, and not shareholders, is critical to their ability to assert a prior interest in the Sullivan Escrow property. As such, the Dissenting Shareholders would be entitled to be paid on their claims from FCC's assets prior to all of its other shareholders and to the exclusion of all creditors of the Debtor—the majority shareholder of FCC.

The Dissenting Shareholders also rely on the corollary principle that a corporation cannot limit its creditors' recoveries to a fund which a corporation decides to set aside. Finally, the Dissenting Shareholders rely on decisions of other bankruptcy courts from other states which have ruled that the claims of a corporation's creditors must be paid before assets of a dissolved corporation can pass into the estate of a bankrupt shareholder. Consequently, the Dissenting Shareholders conclude that the Trustee succeeds only to the interest in property of the Debtor, and none of the escrowed property passed to the Trustee pursuant to 11 U.S.C. § 541, because the Debtor had no right to the escrowed property, thereby cutting off the claims of creditors of the Debtor's estate.

Whether FCC has been liquidated plays an equally crucial role in the Dissenting Shareholders' line of reasoning. As previously noted, the Sullivan Escrow provided that the property was to be distributed to FCC unless FCC had been liquidated at which time the property was to be distributed to the majority shareholder—the Debtor. According to the Dissenting Shareholders, even though FCC dissolved on April 16, 1985, it has yet to be fully liquidated because the Thomson Litigation had not been finally resolved. Under Illinois law "dissolution" is distinct from "liquidation". The Dissenting Shareholders rely on certain provisions of Ill.Rev.Stat. ch. 32, para. 12.30 (1988) which provides in relevant part that:

    (a) Dissolution of a corporation terminates its corporate existance [sic] and a dissolved corporation shall not therafter [sic] carry on any business except

that necessary to wind up and liquidate its business and affairs, including:

    .    .    .    .    .

    (3) ... discharging or making provision for discharging its liabilities.

    .    .    .    .    .

    (c) Dissolution of a corporation does not:

    .    .    .    .    .

    (5) Abate or suspend a ... civil ... proceeding pending by or against the corporation on the effective date of dissolution.

Ill.Rev.Stat. ch. 32, para. 12.30 (1988). On this point, the Dissenting Shareholders also rely on Illinois case law defining "dissolution" as a time at which a corporation ceases to carry on business as distinguished from "liquidation" which is the process of settling affairs after dissolution, although not statutorily defined. Thus, the Dissenting Shareholders maintain that FCC, though admittedly dissolved, is still not fully liquidated because their claims remain unpaid and the Thomson Litigation remains pending.

Under this line of reasoning, the Dissenting Shareholders conclude that all proceeds of the escrowed property must be paid to them because their unpaid claims, plus interest, far exceed the proceeds held by the Trustee. At a minimum, they contend that they are entitled to receive at least that amount per share as received by the other shareholders resulting from FCC's dissolution which was consideration in cash and stock totalling $54.47 per share. Hence, they maintain that their aggregate minority shares should receive a minimum of $846,842.00 ($54.57 × 15,546.95 shares), not including interest.

### B. The Trustee's Arguments

At the heart of the Trustee's argument (supported by Carrier and Altheimer & Gray) is the above-mentioned provision of the Sullivan Escrow. The Trustee contends that FCC was liquidated, and thus all of the escrowed property became property of the Debtor's estate to which the Trustee succeeds under 11 U.S.C. § 541. Central to their arguments is the undisputed fact that

FCC has been admittedly dissolved, and therefore effectively liquidated.

The Trustee points to several areas as supporting his claim of FCC's liquidation. Primarily, the Trustee contends that a liquidation occurs once the liabilities of FCC were either paid or otherwise provided for, and the assets of the corporation were distributed or otherwise transferred via the Liquidating Trust and the Sullivan Escrow. According to the Trustee, the plan of liquidation adopted by FCC's directors evidences a complete provision for liquidation on October 24, 1983. Trustee's Exhibit No. 2 and Dissenting Shareholders' Exhibit No. 1. The Trustee explains that this plan of liquidation instructed the officers of FCC to pay, or provide for, all the liabilities of the corporation and to distribute all remaining assets to its shareholders. The Sullivan Escrow was established and funded in 1984. According to the Trustee, when the Liquidating Trust was created on January 1, 1985, into which all the then remaining assets of FCC were conveyed for the purpose of "providing for" the remaining claims against FCC, same included the Dissenting Shareholders. From that point in 1985 through 1988 when the Liquidating Trust terminated by its own terms and all times thereafter, the only distribution that could be made out of the Sullivan Escrow under its terms was to the Debtor. Thus, the Trustee concludes that all proceeds of the escrowed property are now a part of the Debtor's estate and are not subject to any superior claims of the Dissenting Shareholders.

The Trustee contends for purposes of Section 12.30 of the Illinois Business Corporation Act, that a corporation is "liquidated" in circumstances such as exist here even if claimants were not paid cash because the provisions for the claims asserted by the Dissenting Shareholders were adequate. According to the Trustee, the Dissenting Shareholders had available remedies to secure their claims. They could have obtained a judgment in their state court action, and satisfied it out of the specific fund that been set aside for them, before the Debtor apparently distributed those proceeds from the Liquidating Trust without notice to them. According to the Trustee, the Dissenting Shareholders also could have, but failed to, institute a pre-bankruptcy attachment action. The Trustee further contends that the Dissenting Shareholders still have the remedy to follow the proceeds previously distributed to the non-dissenting shareholders, who took with notice of their outstanding claims, and seek judgment and satisfaction from them. Thus, they are now barred from asserting their interests in the proceeds of the Sullivan Escrow. The Trustee cites case support for the proposition that the Dissenting Shareholders had to earlier pursue the Debtor, but are now time barred from satisfying their claims from the escrowed property.

In addition, the Trustee argues that the stock held in the Sullivan Escrow was a certified security as defined in Ill.Rev.Stat. ch. 26, para. 8–102(1)(a) (1988) subject to the transfer requirements of Ill.Rev.Stat. ch. 26, para. 8–313(1)(a) (1988). As a result of the deposit of the stock certificate with the Bank as escrow agent, FCC's rights in the stock were thereafter limited by and subject to the terms of the Sullivan Escrow Agreement. FCC was only entitled to the escrowed property if it had not been "liquidated"; otherwise, same was to be distributed to the Debtor as the majority shareholder. The Dissenting Shareholders are not in any effective secured or other priority position under the Bankruptcy Code with respect to the Sullivan Escrow proceeds to the exclusion of the other unsecured pre-petition claimants holding claims against the Debtor.

## IV. DISCUSSION

■ This matter involves the infrequent interface between shareholder appraisal rights under state corporation law and competing interests of other creditors under the Bankruptcy Code. A debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). State law usually defines a debtor's interest in property. *Butner v. United States*, 440 U.S. 48, 99 S.Ct.

914, 59 L.Ed.2d 136 (1979); *In re K & L Ltd.*, 741 F.2d 1023, 1030 n. 7 (7th Cir. 1984). The United States Supreme Court has counseled that where state property law and federal bankruptcy law conflict, the latter controls. *Butner*, 440 U.S. 48, 99 S.Ct. 914. The appropriate starting point, therefore, is to determine what interests the Dissenting Shareholders have pursuant to their appraisal rights vis-a-vis other shareholders and creditors of FCC.

■ The Court's analysis begins with the black letter principle of Illinois corporate law that treats a corporation's assets upon dissolution as belonging to its shareholders as tenants in common, subject to rights of creditors and legal claims of third persons. *In re Midwest Athletic Club*, 161 F.2d 1005 (7th Cir.1947); *Crocker v. Commissioner*, 84 F.2d 64 (7th Cir.1936); *see also* 13 *Illinois Law and Practice*, § 640 Corporations at 708 (1955 and 1991 Supp.). No party has addressed this operative doctrine, which is applicable and controlling in part, because the facts unequivocally establish FCC's dissolution in 1985.

For purposes of this matter, former Section 73 of the Illinois Business Corporation Act provides the statutory basis for the claims of the Dissenting Shareholders. *See, generally*, 13 *Illinois Law and Practice*, § 613 Corporations (1955 and 1991 Supp.); Murdock, *The Illinois Business Corporation Act*, § 73 (3rd ed. 1975 and 1984 Supp.). This statute provided in relevant part as follows:

> In the event that a sale or exchange of all or substantially all of the property and assets of a corporation otherwise than in the usual and regular course of its business, is authorized by a vote of the shareholders of the corporation, any shareholder who shall not have voted in favor thereof, may, within twenty days after the vote was taken, make written demand on the corporation for the payment to him of the fair value of his shares as of the day prior to the date on which the vote was taken authorizing the sale or exchange. Such demand shall state the number and class of the shares owned by such dissenting shareholder.

> Any shareholder failing to make demand within the twenty day period shall be conclusively presumed to have consented to the sale or exchange and shall be bound by the terms thereof.

> If, within forty days after the date on which such vote was taken, the value of such shares is agreed upon between the dissenting shareholder and the corporation, the corporation shall make payment of the agreed value within ninety days after the date on which the vote was taken authorizing the sale or exchange, upon the surrender of his certificate or certificates representing said shares. Upon payment of the agreed value, the dissenting shareholder shall cease to have any interest in such shares or in the corporation.

> If within such period of forty days the shareholder and the corporation do not so agree, then the dissenting shareholder may, within sixty days after the expiration of the forty day period, file a complaint in any court of competent jurisdiction within the county in which the registered office of the corporation is situated asking for a finding and determination of the fair value of such shares, and shall be entitled to judgment against the corporation for the amount of such fair value as of the day prior to the date on which such vote was taken, together with interest thereon to the date of such judgment. The practice, procedure, and judgment shall be governed by the Civil Practice Act of this State. The judgement shall be payable only upon and simultaneously with the surrender to the corporation of the certificate or certificates representing said shares. Upon the payment of the judgment, the dissenting shareholder shall cease to have any interest in such shares or in the corporation. Unless the dissenting shareholder shall file such complaint within the time herein limited, such shareholder and all persons claiming under him shall be conclusively presumed to have approved and ratified the sale or exchange and shall be bound by the terms thereof.

The rights of a dissenting shareholder to be paid the fair value of his shares as herein provided shall cease if and when the corporation shall abandon the sale or exchange or the shareholders shall revoke the authority to make such sale or exchange.

Shares acquired by the corporation pursuant to the payment of the agreed value thereof or to the payment of judgment entered therefor, as in this section provided, may be held and disposed of by the corporation as in the case of other treasury shares.

Ill.Rev.Stat. ch. 32, para. 157.73 (1983).

The Dissenting Shareholders' rights to dissent and obtain payment for their shares is a statutory right, which is sometimes called "the appraisal remedy." Invoking this remedy allows shareholders to object and dissent to certain extraordinary corporate matters without fear of retaliation because the corporation is required to buy the dissenting shares at the value immediately prior to the approval or announcement of any such matter. The result is effectively to permit the dissenting shareholders to withdraw from the corporation.

■ Illinois case law construing section 73 notes that the statutory appraisal remedy is not exclusive. *Opelka v. Quincy Memorial Bridge Co.*, 335 Ill.App. 402, 82 N.E.2d 184 (1948). Illinois courts have further observed that fraud is an independent ground for the exercise of equitable jurisdiction and that section 73 does not, and cannot, constitutionally take away a fraud action or equitable relief sought therein. *Robb v. Eastgate Hotel, Inc.*, 347 Ill.App. 261, 106 N.E.2d 848 (1952).

The Seventh Circuit has noted that the appraisal rights and remedies under Illinois law are not exclusive. *See Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326 (7th Cir.1969). In construing section 70 of the Illinois Business Corporation Act in the corporate merger scenario, the Court held that the dissenters' appraisal rights had no bearing on the propriety of their separate derivative action charging a violation of Rule 10b–5 under the 1934 Securities and Exchange Act. Thus, the Dissenting Shareholders also have alternative remedies which they apparently are pursuing incidental to or as part of the Thomson Litigation.

Although it is undisputed that the Dissenting Shareholders have followed the provisions of section 73 within the required time frames for performance of the various steps they have taken, they have not reduced their rights under section 73 in the Thomson Litigation to a judgment against FCC for the fair value of their shares as of October 23, 1983. This omission is crucial because the Dissenting Shareholders conclude their appraisal rights are "perfected", citing *Stanton v. Republic Bank of South Chicago*, 202 Ill.App.3d 476, 147 Ill. Dec. 724, 559 N.E.2d 1064 (1st Dist.1990), even though they have failed to obtain a judgment.

*Stanton* is a case of first impression addressing the sole issue of whether dissenting shareholders were entitled under the Illinois Banking Act to receive stock dividends declared and paid between the merger date, and the date upon which the fair value of the dissenting shareholders' shares were determined. On interlocutory appeal, the *Stanton* court construed a separate statutory appraisal right under Section 29 of the Illinois Banking Act, Ill.Rev. Stat. ch. 17, para. 336 (1987), not former Section 73 of the Illinois Business Corporation Act. In dicta, however, the *Stanton* court discussed both Section 73 of the Illinois Business Corporation Act, and the statement from *Bauman v. Advance Aluminum Castings Corp.*, 27 Ill.App.2d 178, 169 N.E.2d 382 (1st Dist.1960), that once having made the election, a dissenting shareholder cannot dismiss his appraisal lawsuit and "resume" his status as a stockholder. *Stanton* further cited with approval *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245 (Mo. 1968), for the proposition that the clear intent of the Missouri statute, patterned after the Illinois Business Corporation Act, was to change the status of a dissenting shareholder to that of a creditor, at least superior to the distributive rights of the remaining shareholders.

From such dicta in *Stanton, Bauman* and *Flarsheim,* the Dissenting Shareholders in this matter conclude that they have perfected their appraisal rights and enjoy a superior position and claim to the proceeds of the Sullivan Escrow. The Court disagrees with the Dissenting Shareholders' reasoning and finds *Stanton* distinguishable and inapposite.

■ The Dissenting Shareholders' conclusion is flawed under the undisputed facts of this matter, the plain meaning of the operative statutory text of section 73, the relevant provisions of the Bankruptcy Code concerning claims, and the priorities of distributions of a debtor's interests in property. The undisputed facts show that the Dissenting Shareholders' appraisal rights have not yet been reduced to judgment in accordance with all steps under section 73. Thus, it is premature to say that their section 73 appraisal rights have been "perfected." The pertinent inquiry is whether their claims are somehow secured or entitled to priority.

A fair reading of the plain language used in the text of section 73 shows that statute only confers upon them the right and remedy to receive a judgment against FCC for the value of their shares as of a certain date. The text of section 73 is devoid of any language elevating their otherwise unsecured pre-judgment and pre-petition claims against FCC to that of lienholder status.

These provisions of the statutory text of section 73 do not create any sort of pre-judgment statutory lien against the shares which the Trustee could not avoid under 11 U.S.C. § 545 [3], nor any secured claim under 11 U.S.C. § 506 [4]. Rather, in order for the Dissenting Shareholders to elevate their claims to secured status, they would first have had to obtain a judgment in the Thomson Litigation pre-bankruptcy, and enforce

---

**3.** Section 545 provides as follows:

The trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—

(1) first becomes effective against the debtor—

(A) when a case under this title concerning the debtor is commenced;

(B) when an insolvency proceeding other than under this title concerning the debtor is commenced;

(C) when a custodian is appointed or authorized to take or takes possession;

(D) when the debtor becomes insolvent;

(E) when the debtor's financial condition fails to meet a specified standard; or

(F) at the time of an execution against property of the debtor levied at the instance of an entity other than the holder of such statutory lien;

(2) is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property at the time of the commencement of the case, whether or not such a purchaser exists;

(3) is for rent; or

(4) is a lien of distress for rent.

11 U.S.C. § 545.

**4.** Section 506 provides:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

11 U.S.C. § 506.

same in accordance with the provisions of Ill.Rev.Stat. ch. 110, para. 12–101 *et seq.* Lacking such judgment against FCC, the Dissenting Shareholders could not enforce or secure their undetermined appraisal claims pre-bankruptcy (to the exclusion of the Trustee's claims and 11 U.S.C. § 541), via the usual post-judgment remedies, including garnishment, Ill.Rev.Stat. ch. 110, para. 12–702 *et seq.*, or levy and sale on the corporation's stock held in the Sullivan Escrow. *See* Ill.Rev.Stat. ch. 110, paras. 12–171 to 12–175. Under the text of section 73, until they surrender their share certificates at the time of payment of the appraisal remedy judgment they have yet to receive, the Dissenting Shareholders still occupy shareholder status, notwithstanding their pending appraisal claims against FCC.

Likewise, the Dissenting Shareholders' claims do not appear to be secured by any equitable lien under Illinois law. There is no express agreement indicating any intent that the Sullivan Escrow or its proceeds were to stand as security for their claims, or where FCC and Cole Taylor Financial Group, Inc. promised to convey the proceeds and property paid into the Sullivan Escrow as security for their claims. *See Oppenheimer v. Szulerecki*, 297 Ill. 81, 87–88, 130 N.E. 325 (1921); *In re Brass Kettle Restaurant, Inc.*, 790 F.2d 574, 575 (7th Cir.1986).

Consequently, the Dissenting Shareholders would not qualify as secured creditors under 11 U.S.C. §§ 506 or 545, nor priority class claimants under 11 U.S.C. §§ 503[5] and 507.[6] Rather, the Dissenting Share-

5. Section 503 provides:

(a) An entity may file a request for payment of an administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case:

(B) any tax—

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title; or

(ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case; and

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph;

(2) compensation and reimbursement awarded under section 330(a) of this title;

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(A) a creditor that files a petition under section 303 of this title;

(B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

(C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders

other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; or

(E) a custodian superseded under section 543 of this title, and compensation for the services for such custodian;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

(5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services other than in a case under this title; and

(6) the fees and mileage payable under chapter 119 of title 28.

11 U.S.C. § 503.

6. Section 507 provides:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

(2) Second, unsecured claims allowed under section 502(f) of this title.

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or

the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual.

(4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

(5) Fifth, allowed unsecured claims of persons—

(A) engaged in the production or raising of grain, as defined in section 557(b)(1) of this title, against a debtor who owns or operates a grain storage facility, as defined in section 557(b)(2) of this title, for grain or the proceeds of grain, or

(B) engaged as a United States fisherman against a debtor who has acquired fish or fish produce from a fisherman through a sale or conversion, and who is engaged in operating a fish produce storage or processing facility—

but only to the extend of $2,000 for each such individual.

(6) Sixth, allowed unsecured claims of individuals, to the extent of $900 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

(7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(A) a tax on or measured by income or gross receipts—

(i) for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;

(ii) assessed within 240 days, plus any time plus 30 days during which an offer in compromise with respect to such tax that was made within 240 days after such assessment was pending, before the date of the filing of the petition; or

(iii) other than a tax of a kind specified in section 523(a)(1)(B) or 523(a)(1)(C) of this title, not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case;

(B) a property tax assessed before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition;

(C) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity;

(D) an employment tax on a wage, salary, or commission of a kind specified in paragraph (3) of this subsection earned from the debtor before the date of the filing of the petition, whether or not actually paid before such date, for which a return is last due, under applicable law or under any extension, after three years before the date of the filing of the petition;

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition;

(F) a customs duty arising out of the importation of merchandise—

(i) entered for consumption within one year before the date of the filing of the petition;

(ii) covered by an entry liquidated or reliquidated within one year before the date of the filing of the petition; or

(iii) entered for consumption within four years before the date of the filing of the petition but unliquidated on such date, if the Secretary of the Treasury certifies that failure to liquidate such entry was due to an investigation pending on such date into assessment of antidumping or countervailing duties or fraud, or if information needed for the proper appraisement or classification of such merchandise was not available to the appropriate customs officer before such date; or

(G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss.

(8) Eighth, allowed unsecured claims based upon any commitment by the debtor to the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution.

(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

holders qualify as "creditors" having pre-petition claims against the Debtor, as well as FCC. *See* 11 U.S.C. § 101(10)(A).[7] The Court holds their claims are neither secured nor afforded any priority under either section 73 of the Illinois Business Corporation Act or the Bankruptcy Code. Since dissolution in 1985, under *Midwest Athletic Club*, the Dissenting Shareholders have been, and still are, tenants in common with the other FCC shareholders of its remaining undistributed assets, not creditors.

The Dissenting Shareholders rely on *Snyder v. Nathan*, 353 F.2d 3 (7th Cir. 1965), to establish their status as secured creditors. The case is not exactly on point and does not serve to elevate them to the complete exclusion of the Trustee. *Snyder* held that a corporate creditor with a suit pending at the time of a corporate dissolution had a superior right to payment over preferred stockholders in the distribution of a liquidating corporation's assets. The common law trust fund theory was followed in *Snyder*—property of a corporation is to be regarded as a trust fund for payment of its debts, and its creditors have a superior right for payment of claims over any stockholder. The Dissenting Shareholders conclude that FCC's property, like the *Snyder* corporate property, is held in trust for the benefit of FCC's creditors, who include the Dissenting Shareholders.

The *Snyder* reasoning is distinguishable, however, because the Dissenting Shareholders are not third-party creditors of

FCC. Rather, they remain as minority shareholders of that now dissolved corporation whose appraisal claims have not yet been judicially determined by the appropriate state court. As explained, they have an interest in the escrowed property as tenants in common with the other FCC shareholders. *Midwest Athletic Club*, 161 F.2d at 1008. Notably, the shares of the Dissenting Shareholders have not yet been surrendered to satisfy a judgment which they have yet to receive against FCC in conformance with the remaining provisions of section 73.[8] To apply the common law trust fund doctrine as requested by the Dissenting Shareholders would simply ignore the fact that their appraisal rights claims are both disputed by FCC as well as not yet finally determined, and thus unliquidated and unsecured.

Finally, the Court finds that FCC has not been fully liquidated. Section 12.30 of the current version of the Illinois Business Corporation Act, makes it clear that "dissolution" does not abate the Dissenting Shareholders' pending appraisal remedy. Resolution of the Thomson Litigation, as well as this adversary proceeding, is part of the ongoing process of settling all the affairs of FCC after its 1985 dissolution. "Liquidation" is not a defined term either under the present or former versions of the Illinois Business Corporation Act. *See* Ill. Rev.Stat. ch. 32, para. 1.80 (1988); Ill.Rev. Stat. ch. 32, para. 157.2 (1983). Moreover, it was not a defined term pursuant to the Sullivan Escrow. For purposes of this agreement with respect to FCC, none of

---

Note 6—Continued

(c) For the purpose of subsection (a) of this section, a claim of a governmental unit arising from an erroneous refund or credit of a tax has the same priority as a claim for the tax to which such refund or credit relates.

(d) An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection (a)(3), (a)(4), (a)(5), or (a)(6) of this section is not subrogated to the right of the holder of such claim to priority under such subsection.

11 U.S.C. § 507.

7. Section 101(10)(A) states:

(10) "creditor" means—

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor.

11 U.S.C. § 101(10)(A).

8. The evidence shows that other FCC property was distributed to other shareholders, and is held by them subject to the claims of the corporation's creditors under the *Snyder* doctrine. Those creditors potentially include the Dissenting Shareholders and their recovery against FCC after the Dissenting Shareholders' appraisal rights are finally adjudicated, but not otherwise fully paid.

the case authority cited by, or on behalf of, the Trustee's arguments that FCC has already been liquidated, is either exactly on point, or logically compelling.

Therefore, the Court turns to the commonly accepted definitions put forth in *Black's Law Dictionary*. The term "liquidation" includes among the definitions: "[p]ayment, satisfaction, or collection ... [w]ith respect to winding up of affairs of corporation ... [the] process of reducing assets to cash, discharging liabilities and dividing surplus or loss. Occurs when a corporation distributes its net assets to its shareholders and ceases its legal existence." *Black's Law Dictionary* (6th ed. 1991). The Trustee's conclusion that upon termination of the Liquidating Trust, the liquidation of FCC was complete, ignores both the unresolved Thomson Litigation and the then unredeemed stock held in the Sullivan Escrow. The Court rejects such conclusion. Furthermore, the end result of cutting off the claims of all other corporate shareholders is an inequitable result, especially in light of some of the pre-petition conduct of the Debtor in distributing proceeds, thereby depleting the Liquidating Trust without notice to the Dissenting Shareholders. Accordingly, applying the present facts to the above definition, the Court concludes that the "liquidation" of FCC is still not yet completed.

Under the terms of the Sullivan Escrow and the Liquidating Trust, all the property in the Sullivan Escrow was to be distributed to the Debtor as the majority shareholder, only if FCC had been "liquidated;" otherwise, under the terms of the escrow it was to revert to FCC. Return of the proceeds of the escrowed property to FCC, however, is impractical and legally impossible as a result of its dissolution.

What then is the appropriate disposition of the proceeds escrowed property held by the Trustee? The Court rejects the competing conclusions of both the Dissenting Shareholders and the Trustee that all proceeds of the escrowed property are properly payable to one side to the complete exclusion of the other. The Court will rule in accord with the common law doctrine that treats assets of a dissolved corporation as belonging to its shareholders as tenants in common, subject to the claims of creditors. This finding is consistent with both the text of Section 541 of the Bankruptcy Code, while mindful of the common law trust fund and shareholders are tenants in common of a dissolved corporation's assets doctrines of Illinois corporate law. No other party actively participated at the trial to prove any liquidated claims held against FCC as that corporation's unpaid third-party creditors. Thus, because no such corporate third-party creditors under the trust fund doctrine proved up any prior claims, the now liquidated proceeds from the Sullivan Escrow, which otherwise would be payable to FCC, are available for distribution and shall be ordered to be paid to all its shareholders pro rata in direct proportion to their various share holdings. This will effectively sever their tenancy in common, and provide for a long awaited distribution to all FCC shareholders, including, but not limited to, the Dissenting Shareholders and the Trustee.

Only the Debtor's shareholder interest passed to the Trustee, by operation of section 541, for the benefit of all creditors of the Debtor's bankruptcy estate. From the stipulated facts, there appear to have been outstanding 135,279.72 shares of FCC. In the aggregate, the Dissenting Shareholders held 15,546.95 shares or 11.49244% (15,546.95 ÷ 135,279.72). The Debtor held 80,159 shares or 59.25426% (80,159 ÷ 135,279.72). The remaining shares were held by the other defendant shareholders and represent an aggregate 39,573.77 shares or 29.2533% (39,573.77 ÷ 135,279.72). Under section 541, the Court determines that the Debtor's percentage interest in the escrowed property passed to the Trustee. The remaining proceeds should be distributed pro rata to the Dissenting Shareholders and the other shareholders of FCC. The Dissenting Shareholders still have their appraisal remedy to pursue. They also have the potential source of recovering any unsatisfied appraised value of their

shares from those other shareholders of FCC who already received earlier distributions from the Liquidating Trust, including the Debtor, whose estate is subject to their claims as well.

## V. CONCLUSION

For the foregoing reasons, the Court holds that all shareholders of the dissolved Illinois corporation, Ford City Corporation, share pro rata interests as tenants in common in the proceeds held in escrow by the Trustee. The Court hereby concludes and determines that the relative percentage interests of the parties are as follows:

| | |
|---|---|
| The Trustee | .5925426 or 59.25426% |
| Dissenting Shareholders | .1149244 or 11.49244% |
| All other shareholders of FCC | .2925330 or 29.25330% |
| **TOTAL** | **1.0000000 or 100%** |

This Opinion serves as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

See written Order.

## ORDER

For reasons set forth in a Memorandum Opinion dated the 30th day of September, 1992, the Court holds that all shareholders of the dissolved Illinois corporation, Ford City Corporation, share pro rata interests as tenants in common in the proceeds held in escrow. The relative percentage interests of the parties in the proceeds held by the Trustee from the escrowed property are computed in proportion to their respective shareholdings as follows: the Debtor, Milton D. Ratner, whose interest passed to Alexander S. Knopfler, as Trustee of the Debtor's estate—80,159 shares or 59.3%; Evanston Bank, as trustee under Trust Agreement No. 1294—71 shares or .05%; Richard and Marjorie Friedman—140 shares or .1%; Joseph Greene—100 shares or .07%; John Hopkins—460 shares or .34%; Stella Klabacka—400 shares or .3%; Patrick Athy—100 shares or .07%; Patrick and Catherine Reilly—300 shares or .22%;

William Boyd—1,939.77 shares or 1.4%; Cornelius Riordan—266 shares or .2%; Eugene Riordan—267 shares or .2%; David Sypniewski—267 shares or .2%; I–Del Incorporated—14,492 shares or 10.7%; Marvin Lourie—10 shares or .0074%; John Wheeler—115 shares or .085%; Maynard Wheeler—704 shares or .52%; Dr. and Mrs. Neal Kaufman—10 shares or .0074%; Francine Kaufman 698 shares or .516%; Gary Ratner as custodian for Uri Ratner—10 shares or .0074%; Gary Ratner as custodian for Yael Ratner—10 shares or .0074%; JGF Partnership—1,351 shares or 1%; Rentar Trailer & Container Leasing Company—873 shares or .65%; Rachel Ratner—17,000 shares or 12.6%; Charlotte E. Thomson—2,092.56 shares or 1.6%; Charlotte E. Thomson, as executor of the estate of John C. Thomson—12,193.39 shares or 9%; Richard E. Webber—291 shares or .2%; and Michael F. Sullivan—970 shares or .7%. The Trustee is hereby ordered to distribute forthwith the escrowed proceeds accordingly.